Wallace and Deanna **DYALL,**
Appellants,

v.

**SIMPSON PASADENA PAPER
COMPANY, Appellee.**

No. 14–01–00432–CV.

Court of Appeals of Texas,
Houston (14th Dist.).

Nov. 24, 2004.

Alice Oliver–Parrott, Maria Teresa Arguindegui, Houston, for appellants.

Matthew W. Brown, Gary G. Green, Houston, for appellee.

## MAJORITY OPINION ON EN BANC REHEARING

· J. HARVEY HUDSON, Justice.

This appeal arises from a claim of damages for injuries allegedly sustained by the inhalation of chlorine dioxide vapors by an employee of an independent contractor hired to make repairs on a leaking flange at a paper mill. Wallace Dyall, an employee of Industrial Pipe and Plastic, Inc. ("IPP"), and his wife, Deanna Dyall (collectively, "Dyall"), sued the owner of the mill, Simpson Pasadena Paper Company ("Simpson"), asserting claims for negligence, gross negligence, and negligence per se. Simpson filed for summary judgment, arguing that it exercised no control over the repairs being done on its property, and thus, under Chapter 95 of the Texas Civil Practice and Remedies Code, could not be held liable. The trial court granted a take-nothing summary judgment in favor of Simpson. On original submission, a divided panel of this court affirmed the trial court's judgment. On rehearing, a divided panel again affirmed the trial

court's judgment. On rehearing en banc, we withdraw our panel opinion on rehearing of July 17, 2003, and substitute the following majority and dissenting opinions.

In five points of error, Dyall contends the trial court erred in granting summary judgment because (1) genuine issues of material fact exist as to the level of control exercised by Simpson over the repair operations for which Wallace Dyall was hired, and (2) he asserted a claim that was not precluded by the operation of Chapter 95. We affirm.

The summary judgment record reflects that on April 19, 1998, Bruce Stiles, a shift supervisor employed by Simpson, was engaged in a routine inspection of the facilities when he noticed a pinhole leak in a pipe near the pine bleaching plant.[1] Stiles knew the pipe supplied the plant with chlorine dioxide, a bleaching agent. He observed the chemical spraying onto a concrete pad where it was vaporizing and forming a green gas cloud symptomatic of a chlorine dioxide leak. Stiles called the bleach plant operator and ordered him to shut down the facility. The pipe was then purged with water to remove the chlorine dioxide, and the affected area was washed down. However, due to a leaking valve, the flow could not be entirely stopped, but the leak apparently diminished from a "spray" to a "dribble." Stiles also observed the liquid dripping from the pipe was now both clear and odorless. Except in very low concentrations, chlorine dioxide is yellow and pungent. Thus, Stiles assumed the liquid was primarily water and that any trace of chlorine dioxide in the water was at such low levels it presented no significant respiratory hazard.[2]

The following day, at approximately 10:45 a.m., Joey Carter, a fiberglass technician, and his helper, Wallace Dyall, employed by Industrial Pipe and Plastic (IPP), were dispatched to the Simpson Pasadena Paper Company to repair the leak. Upon arriving at the gate, at approximately 11:00 a.m., an unidentified gentleman directed Carter and Dyall to a small office building on the plant complex where they met Jerry Elleven who said he was having a problem with a leaking flange. He also said replacement of the flange would require shutting down the plant, so he asked Carter and Dyall if they could stop the leak without replacing the flange. According to Dyall, no safety warnings were administered, no safety data sheets were given to him, and he "was given the impression ... that there was no danger to us concerning the substance that was leaking."[3]

---

1. Although the parties agree on most of the underlying facts, the summary judgment record contains conflicting statements regarding some of the events relating to the accident. Accordingly, we view the summary judgment evidence in the light most favorable to Dyall. *Blackburn v. Columbia Med. Ctr. of Arlington Subsidiary, L.P.*, 58 S.W.3d 263, 269 (Tex. App.-Fort Worth 2001, pet. denied).

2. Stiles said he would not ordinarily alert an independent contractor to the presence of chlorine dioxide or suggest protective equipment if the exposure level was so low that no odor of the chemical could be detected.

3. Paul Licata, an environmental and safety manager for Simpson, testified that if the liquid had contained anything more than a trace of chlorine dioxide it would have been immediately apparent to anyone in the area due to its pungent odor and irritability. In fact, Licata testified that if the flange had been leaking chlorine dioxide, there would have been no need to advise Carter and Dyall of the danger because the pungent odor and irritation would have made it impossible for anyone to work in the area without protective equipment. Licata also said that while it would have been physically impossible for anyone to remain in the vicinity of a chlorine dioxide leak, he would never knowingly allow an independent contractor to work in the vicinity of chlorine dioxide without goggles and a respirator. James Bueker, the bleach

Dyall admitted, however, that he could not recall whether Simpson personnel told him the pipe might contain traces of chlorine dioxide.[4] Carter, also, could not recall whether Simpson employees ever identified the substance leaking from the flange. Both men acknowledged, however, that someone at the plant may have told them the substance leaking from the pipe contained chlorine dioxide. Moreover, it is undisputed that within 25 feet of the leaking flange a warning sign attached to a support beam said, "Chlorine Dioxide." The sign also recommended chemical goggles, a face shield, ventilation, no smoking, and a scuba gas respirator. Carter also admitted that, as Dyall's supervisor, it was his responsibility to evaluate the situation and determine the toxic hazards present at each job site.

Before proceeding to the site of the leaking flange, Elleven asked Carter and Dyall if they had full air packs. A "full air pack" has a clear face shield and an air tank which supplies the wearer with air much like an underwater diver. Carter informed Elleven that they had full air packs "back at the shop." According to Dyall, Elleven said, "Well, that's all right. I don't think you'll need them." Elleven then directed Carter and Dyall to "the safety guy" to pick up two throw-down packs. A "throw-down pack" is also known as an emergency escape respirator. It is not designed for sustained use, but is to be clipped to the wearer's belt. In the event of a toxic gas leak, the wearer is advised to insert the breathing tube in his mouth, use the nose clip to seal his nose, and immediately leave the area. While the user escapes to a safe area, all his air is filtered through a charcoal filter.

Carter and Dyall reported to the Simpson safety director who gave them two emergency escape respirators. Carter mentioned to the safety director that he and Dyall had half-face respirators in their truck. A half-face respirator covers the mouth and nose and is usually used in conjunction with goggles. The user's air is filtered through specially designed canisters attached to the respirator, much like a gas mask. As a safety precaution, however, the Simpson employee insisted that Carter and Dyall also have escape respirators with them before entering the area of the pine bleaching plant. Further, he advised Carter and Dyall that if they should smell any unknown odor, they should immediately don their escape respirators and leave the area.

Thereafter, Carter and Dyall drove their truck to the site of the leaking flange where they observed a Simpson employee

---

plant superintendent also testified that he would not knowingly allow an independent contractor to work on a chlorine dioxide leak without a respirator.

4. Dyall testified as follows:

Q. And he asked you guys to repair a flange that was leaking?
A. Correct.
Q. Did he tell you what was leaking?
A. No. I don't recall him saying what was leaking, just the flange was leaking.
Q. Can you tell me, as you sit here right now, whether or not it was ever discussed as to what was leaking?
A. Not that I recall at that time, no.

Q. Would it be fair to say that he may have told—or discussed what was leaking, you just don't remember?
A. I don't recall discussing that, no.
Q. May have, may not have, just can't remember?
A. I just can't remember.
Carter testified similarly:
Q. And I think you testified earlier—and I could be wrong—but I thought you testified earlier that you can't remember if someone told you about working on $ClO_2$.
A. Correct.
Q. So they may have, they may not have, you just don't remember.
A. Right.

with a water hose washing what appeared to be a thick white soap foam down a nearby drain. Before proceeding into the area, Carter asked, "Is it safe for us to go in [the foam] or do we need rubber boots?" The employee told Carter he did not need boots and told him he could enter the area. He also identified the substance he was washing down the drain, but Carter could not remember the name of the substance at the time of his deposition.[5]

Upon inspecting the leak, Carter noticed a half-inch pipe running from the pine bleaching plant. A greenish-yellow liquid (consistent with the appearance of chlorine dioxide) was dripping from a crack between the threads and a flange.[6] The pipe and flange were located no more than three inches above a concrete pad. As the liquid dripped on the pad, it was immediately diluted by water from a ¾ inch hose and washed into a drain. Although Simpson employees were working only a few feet from the leak, they wore no pro-

tective paraphernalia. Perceiving no hazard, Carter and Dyall left their respirators in the truck. They then tried to contain the leak with a substance known as Hydroplug. Other than gloves and goggles, they wore no protective gear while they worked. Although his testimony was strongly controverted, Dyall alleges he got the liquid on his hands, arms, legs, and knees.[7]

At some point during their repair efforts, Carter noticed a pinhole leak about four feet from the broken flange. Every ten or fifteen seconds, a drop of liquid would fall to the ground and instantly vaporize making a small white cloud. Carter alerted Simpson employees working in the area to the new leak and asked, "Is it the same thing or is it something else?" A Simpson employee inspected the leak and said, "Oh, it's all in—it's the same pipe." Reassured that the new leak was nothing more than the same liquid leaking from the flange, Carter and Dyall returned to

5. Dyall does not contend (nor is there any evidence in the record) that the foam was toxic or that it was the cause of Dyall's alleged injuries.

6. The testimony of Carter and Dyall was contradicted in this respect by Stiles who said he was within five feet of the men while they worked on the flange and the liquid was at all times clear. Stiles, who had previously been exposed to chlorine dioxide on numerous occasions, testified that if the liquid had contained any color, it would also have had the pungent odor of chlorine. Carter and Stiles agreed that there was no odor of chlorine emanating from the leaking fluid.

7. Because the leaking flange was located only one to three inches above the ground, it is difficult to conceive how the liquid could have dripped on Dyall's hands, arms, legs, and knees. Moreover, as Carter's helper, Dyall did not work directly on the leaking flange. Carter testified:

 Q. Okay. You are at the site of the pipe, decide that you're going to use Hydro-plug,

you have Wallace [Dyall] mix it. And what? Does he pass it to you and you take it and start packing it [on the flange]?
 A. Yes.
 Q. And I guess you're down on your knees because the pipe is so close to the ground?
 A. Correct.
 * * *
 Q. To your knowledge, did Mr. Dyall do anything other than get things for you and mix Hydro-plug?
 A. To my knowledge, that's it.
 Q. If he said that he was working on the pipe and flange with you, do you disagree?
 A. Yes.
 Q. If he said that the pipe and flange he was working on was dripping all over his shirt sleeves and down his pant legs, does that make any sense to you?
 A. No, it doesn't.
 Q. You disagree with that?
 A. Yes, I do.
 Q. Were you the only one that was trying to fix this pipe?
 A. Yes.

working on the flange. In his deposition Carter acknowledged that the liquid dribbling from the broken flange and the liquid dripping from the nearby pinhole leak had no discernible odor. The Hydro-plug mixture, however, releases an "ammonia-chlorine type smell," that burns the nose. Carter admitted that the only smell of chlorine that day came from the Hydro-plug mixture. In fact, Dyall began coughing and choking on the fumes of the Hydro-plug mixture, and Carter further admitted that he and Dyall should have worn their half-face respirators to protect them from the gases of their own Hydro-plug mixture.[8]

After working an hour and a half, it became apparent the leak could not be stopped using Hydro-plug. Records indicate that at approximately 12:30 p.m., the entire pine bleaching plant was shut down. Once the pine bleaching plant was shut down and the flow of the liquid was stopped, Simpson advised Carter and Dyall that it would have its own plumbers replace the broken flange.

As Carter and Dyall prepared to leave the area, both men became nauseous, and they each vomited. Carter and Dyall then returned to their shop to pick up some flange plugs which the Simpson employees needed to replace the flange. Before returning to the Simpson facility, Dyall vomited again.[9]

After obtaining the necessary flange plugs, Carter and Dyall returned to the Simpson facility. However, before entering the work area, they donned their half-face respirators for the first time. They delivered the flange plugs to the Simpson employees who were already engaged in replacing the flange. Carter noticed the Simpson employees were still working without the benefit of respirators or air packs. Apparently, they suffered no ill effects. Carter and Dyall returned the throw-down packs to Simpson and went back to the IPP office.

The following day, Dyall reported to work, but was not feeling well. IPP sent him to a company physician. Dyall alleges he has had severe respiratory problems since his exposure to the leaking flange.

## STANDARD OF REVIEW

The standard we follow in reviewing a summary judgment is well-established.

8. Carter testified:

> Q. Did Mr. Dyall indicate that he wasn't feeling well after y'all started working on that liquid?
> A. Yes. I would say about an hour.
> Q. What did he say? What kind of symptoms was he complaining about?
> A. It was the smell from the Hydro-plug is what—You know, what I smelled is possibly what he smelled. He said he was choking, you know, coughing.
> Q. When you were working around the leak, did you also have any problems with your breathing?
> A. Only when I used the Hydro-plug, the ammonia smell just like (indicating)—it's a smell you don't—
> Q. So Mr. Dyall was complaining about choking and he was choking and coughing? You heard him choking and coughing?

> A. Yes, I heard him cough, yes.

9. Dyall's testimony on this matter was contradicted by Carter. Carter testified that he was nauseous and not feeling well before he ever entered the Simpson facility. After leaving the Simpson plant, Carter and Dyall were thirsty, and they dropped by a convenience store to purchase some beverages. Carter purchased chocolate milk. However, the milk had a sour taste, and Carter did not finish it. Later, as Carter was returning to the Simpson plant, he vomited.

Carter recalls Dyall mentioned he also was not feeling well, but he had no recollection of Dyall ever vomiting. As the two men were preparing to leave the Simpson plant for the second and final time, Carter noticed that Dyall was pale, and he asked Dyall if he was feeling alright. Dyall replied that he was fine.

The movant for summary judgment has the burden to show that no genuine issue of material fact exists and that he is entitled to judgment as a matter of law. Tex.R. Civ. P. 166a(c); *Lear Siegler, Inc. v. Perez,* 819 S.W.2d 470, 471 (Tex.1991); *Nixon v. Mr. Property Management Co.,* 690 S.W.2d 546, 548–49 (Tex.1985). When deciding whether there is a disputed material fact issue precluding summary judgment, we treat proof favorable to the nonmovant as true, and we resolve any doubts in his favor. *Nixon,* 690 S.W.2d at 548–49; *Montgomery v. Kennedy,* 669 S.W.2d 309, 311 (Tex.1984). A defendant, as movant, is entitled to summary judgment if he either disproves at least one essential element of each of the plaintiff's causes of action or establishes all the elements of an affirmative defense. *Am. Tobacco Co. v. Grinnell,* 951 S.W.2d 420, 425 (Tex.1997).

### Chapter 95 of the Texas Civil Practice and Remedies Code

Even before the adoption of Chapter 95, a Texas property owner was not generally subject to liability for injuries sustained by an independent contractor because the owner had no duty to see that an independent contractor performed his work in a safe manner. *Redinger v. Living, Inc.,* 689 S.W.2d 415, 418 (Tex.1985). Simply stated, it was well established that the owner or occupier of property was not an insurer. Thus, where activity leading to injury was conducted by, and was under the control of, an independent contractor, and where the danger arose out of the activity of the independent contractor's staff, the responsibility fell upon the independent contractor, and not the owner or occupier of the property. *Abalos v. Oil Dev. Co. of Texas,* 544 S.W.2d 627, 631 (Tex.1976).

However, two exceptions to this general rule also evolved in Texas jurisprudence. Both exceptions arose from an owner's failure to keep the premises safe, namely: (1) dangers arising from an activity on the premises,[10] and (2) those arising from a premises defect.[11] *Williams,* 952 at 527. The evolution of our jurisprudence has produced conflicting opinions sometimes detrimental to the public policy of minimizing work-related injuries.

For example, in *Tovar v. Amarillo Oil Co.,* the owner of an oil lease hired an independent contractor to drill a well. 692 S.W.2d 469 (Tex.1985). By contract, the owner required the contractor to have a blowout preventer and specified that the kill line should not be used for a fill line on the blowout preventer. The contractor disregarded this safety precaution. The owner was aware of the deviation and did not order the contractor to leave the premises. Thus, when the well blew out and injured one of the contractor's employees, the owner was liable for negligently failing to exercise reasonable care in supervising the contractor's activity. *Id.* at 470.

---

**10.** In *Redinger,* for example, the occupier of property, *i.e.,* a general contractor, was liable for injuries sustained by one subcontractor when he was struck by the tractor of another contractor after the general contractor had ordered both subcontractors to perform their work within a few feet of each other. 689 S.W.2d 415, 417–18 (Tex.1985).

**11.** This category was for those defects that existed on the premises when the independent contractor entered upon the property or that were created through some means unrelated to the activity of the independent contractor. In this situation, the owner or occupier of the property had a duty to inspect the premises and warn the independent contractor of those dangerous conditions of which the owner knew or should have known. *Clayton W. Williams, Jr., Inc. v. Olivo,* 952 S.W.2d 523, 527 (Tex.1997).

Likewise, in *Lee Lewis Const., Inc. v. Harrison*, 70 S.W.3d 778 (Tex.2001), a general contractor was held to have retained the right to control safety on the job site when it required its subcontractors to adhere to its safety rules or face expulsion from the job site. The safety regulation included the mandatory use of a lanyard or lifeline when working in high places to prevent injuries from falls. One of the subcontractor's employees violated the safety rules, did not attach his lanyard to a beam, and subsequently fell to his death while attempting to insulate a tenth floor window on a construction project. Again, the Supreme Court held there was more than a scintilla of evidence that the general contractor had "retained the right to control fall-protection systems on the jobsite." *Id.* at 784. Thus, the general contractor was liable for the death of its subcontractor's employee.

In both of the aforementioned cases, the owner or general contractor would have been in a more legally advantageous position if it had not promulgated safety rules and procedures. The effect of these decisions is arguably antithetical to public policy. "[T]he employer of an independent contractor should not be forced to choose between the risk of injury from not intervening in the contractor's work [and] the risk of liability from such intervention." *Id.* at 793 (Hecht, J., concurring).

Other opinions, however, have favored the public policy of protecting workers. For example, in *Koch Refining Co. v. Chapa*, 11 S.W.3d 153 (Tex.1999), the Supreme Court rejected the argument that the premises owner had retained control over the safety requirements of its independent contractor by having its on-site safety employee observe the work of its contractor. The court concluded "that a premises owner, merely by placing a safety employee on the work site, does not incur a duty to an independent contractor's employees to intervene and ensure that they safely perform their work." *Id.* at 157.

Likewise, in *Dow Chemical Co. v. Bright*, 89 S.W.3d 602 (Tex.2002), an employee of Gulf States, Inc., an independent contractor, sought damages from Dow Chemical Company, the premises owner, for injuries sustained in a work related accident caused by the actions of another Gulf States employee. The plaintiff argued "that Dow had a contractual right to control the premises because Dow required its independent contractors to comply with the safety rules and regulations promulgated by Dow in its Safety and Loss Prevention Manual." *Id.* at 607. The Texas Supreme Court rejected the contention stating, "it is not enough that the premises owner has merely a general right to order the work stopped ... [t]o hold otherwise would deter general contractors from setting even minimal safety standards." *Id.* at 607–08.

In addition to public policy considerations, there are other reasons to question the wisdom of imposing liability upon the property owner for injuries sustained by independent contractors. First, "the contractor has often been hired for its expertise in the work to be done and its superior ability to see that the work is done safely." *Lee Lewis Const.*, 70 S.W.3d at 796 (Hecht, J., concurring). Second, "[a]n employer's liability for accidents should not increase the harder he tries to ensure that his independent contractors work safely and decrease the less he cares what happens." *Id.*

The rationale of subjecting employer's to liability for injuries sustained by independent contractors is also inconsistent with our modern system of worker's compensation. First, the employment of "a subscribing independent contractor presumably includes the cost of providing

worker's compensation coverage related to the work, and the contractor's employer who pays it should have the same protection from extra liability for job-related injuries to the contractor's employees that the contractor has." *Id.* at 795. Second, an "employer should not be exposed to greater risk of liability for wisely entrusting peculiarly dangerous work to a better-skilled independent contractor than if he had undertaken the job with his own less capable employees." *Id.* at 796. Finally, a "worker should not have greater rights as an employee of an independent contractor than he would have as an employee of the contractor's employee." *Id.*

These incongruities were largely rectified by Chapter 95 of the Texas Civil Practice and Remedies Code which was part of a sweeping tort-reform package.[12] It was enacted because the legislature recognized that property owners often want to hire someone with expertise to repair or renovate some improvement on their property. *Kelly v. LIN Television of Texas, L.P.*, 27 S.W.3d 564, 570 (Tex.App.-Eastland 2000, pet. denied). Sometimes the contractor is hired to remedy a dangerous condition on the property and the work, therefore, is potentially hazardous. Chapter 95 provides that a property owner is not liable for the personal injury, death, or property damage to a contractor or his

employees who construct, repair, renovate, or modify an improvement to real property, including injuries arising from the failure to provide a safe workplace unless:

(1) the property owner exercises or retains some control over the manner in which the work is performed, and

(2) the property owner had actual knowledge of the danger or condition resulting in the injury and failed to adequately warn.

TEX. CIV. PRAC. & REM.CODE ANN. § 95.003 (Vernon 1997).

■ The first prong of the statutory exception is a codification of the holding in *Redinger v. Living, Inc.* which adopted the Restatement (Second) of Torts, Sec. 414 and comments.[13] The second prong forecloses the plaintiff's reliance on "constructive knowledge" of the property owner regarding a dangerous condition.[14] In other words, the burden now rests upon the plaintiff to show both (1) control *and* (2) actual knowledge of the danger. These are two independent and necessary conditions to the imposition of liability.[15] The owner may be aware of the danger, but exercise no control, or he may exercise control and have no actual knowledge of the danger; in either instance, the owner is statutorily shielded from liability.[16]

---

**12.** Richard O. Faulk, *Dispelling the Myths of Asbestos Litigation: Solutions for Common Law Courts,* 44 S. TEX. L.REV. 945, 972 (2003).

**13.** George C. Hanks, Jr., *When Sticks and Stones May Break Your Bones: An Overview of Texas Premises Liability Law for Business Owners,* 60 TEX. B.J. 1010, 1021 (1997).

**14.** *Id.*

**15.** Both "conditions must be met before liability will be imposed upon the property owner." *Kelly,* 27 S.W.3d at 567.

**16.** Chapter 95 represents an affirmative change in Texas tort law. Prior to the adop-

tion of Chapter 95, an owner was potentially liable for injuries sustained by an independent contractor even when the danger was readily apparent to the contractor and the owner exercised no control. For example, in *Chilton v. Southwestern Bell Mobile Systems, Inc.,* No. 05–94–01825–CV, 1996 WL 253334, (Tex. App.-Dallas May 1, 1996, writ denied) (not designated for publication), the plaintiff was hired to perform maintenance and repair work on a one-hundred-foot tall cellular transmission tower. *Id.* at *1. It was readily apparent that the service line (a mechanized pulley system for climbing the tower) was not working properly and the sleeve on the safety climb cable was not located at the bottom of

### Simpson's Motion for Summary Judgment

In its Amended Second Motion for Summary Judgment, Simpson argued it was immune from liability under Chapter 95.003 of the Texas Civil Practice and Remedies Code because Carter and Dyall "had complete control over the repairs that they were hired to perform, and ... Simpson did not exercise or retain any control over the repair operation."

In his reply, Dyall argued that Simpson had, in fact, exercised control because "Dyall was not told that he may be exposed to chlorine dioxide at [its] plant, apparently because [Simpson's] shift supervisor, Bruce Stiles, did not think there was enough chlorine dioxide in the leak to hurt Mr. Dyall, since he did not smell it." Dyall also argued that Simpson "failed to inform [him] of what chemical he would be

the cable where he could attach a carabiner. *Id.* at *3. The plaintiff decided to work around these problems by physically climbing the tower without benefit of basic safety equipment. He subsequently fell from a height of sixty to eighty feet. The court of appeals held the owner was potentially liable for plaintiff's injuries under a premises liability theory. *Id.*

Likewise, in *Samco Properties, Inc. v. Cheatham*, 977 S.W.2d 469 (Tex.App.-Houston [14th Dist.] 1998, pet. denied), the owner was liable for injuries to an independent contractor who, unbeknownst to the owner, climbed into the interior of an outdoor sign that was never designed or intended for human entry. The injured party was an electrician employed by an independent contractor who fell while performing maintenance on a large commercial sign mounted on a pole 45 feet above the ground. Although the sign was not designed or constructed for human entry, two holes, approximately 10 inches by 18 inches were located on the top of the sign to permit access to the fluorescent lighting ballast. In an effort to chase pigeons out of the interior of the sign, the decedent was raised to the top of the sign in a lift bucket. He then climbed through one of the aforementioned holes without a safety belt, and fell out of the bottom side of the sign a few moments later

exposed to when [Simpson] called for work to be done" and "[Simpson] lured [Dyall] into a false sense of security in regard to working with [Simpson's] mystery chemical ... [in that Simpson's] employees were not wearing their air packs when they pointed out the leaking flange for [Dyall] to work on."

### Control

■ On appeal, Dyall concedes that Simpson exercised no control over the repair work, but he contends that Simpson had responsibility for "safety matters" in the area to be repaired, and, thus, he "was not entirely free to do the work his own way." This raises an issue as to whether control over "safety matters" is within the scope of the statute's requirement of "control over the manner in which the work is performed." Tex. Civ. Prac. & Rem.Code

when he either slipped or stepped upon the thin aluminum "floor" of the structure. Under these facts, this court held that even though the owner did not supervise the work or observe the contractor's activities, the owner had a duty, nevertheless, to provide suitable warnings to the contractor. *Id.* at 476.

Moreover, prior to the passage of Chapter 95, the owner or occupier of property who retained a right of control could be liable for injuries related to premises defects about which he had no knowledge. In *Clayton W. Williams, Jr., Inc. v. Olivo*, for example, the Texas Supreme Court held the occupier of property, retaining a right of control, may be subject to liability when the employee of an independent contractor is injured by a dangerous condition *created by the independent contractor* if the occupier of the property knew *or should have known* that the independent contractor had carelessly done his work in such a way as to create a dangerous condition, and the occupier of the property failed to exercise reasonable care either to remedy it himself or by the exercise of his control cause the independent contractor to do so. 952 S.W.2d at 529.

It is doubtful that any of the foregoing decisions would survive analysis under the standards promulgated by Chapter 95.

ANN. § 95.003 (Vernon 1997). As discussed above, it would be harmful to worker safety and, thus, to public policy, to hold that control over "safety matters" subjects an owner to liability because such a holding would encourage owners to divorce themselves from all safety concerns. Unless, the owner imposes a safety regulation or procedure that actually causes or contributes to the contractor's injury, we do not deem such regulations as "control over the manner in which the work is performed." *Id.* § 95.003 (Vernon 1997). In other words, unless the owner's "safety" regulation unwisely imperils the contractor, its imposition and observance must be encouraged, not discouraged, and cannot reasonably be considered the type of control the legislature envisioned as coming within the ambit of the statute.

Here, the only "safety regulation" imposed by Simpson was that Carter and Dyall carry emergency escape respirators on their belts before entering the area of the pine bleaching plant. This "safety regulation" did not imperil either man, and it was not the cause of Dyall's alleged injuries. In his appellate brief, Dyall lists sixteen alleged examples of "control" by Simpson—none raise a fact issue as to whether Simpson retained or exercised control over the manner in which Dyall's work was to be performed.

■ Dyall first contends Simpson exercised control by failing to clear the line of chlorine dioxide. While it is certainly true that, as the property owner, Simpson had "control" of its facilities, this is not the type of "control" of which the statute speaks. Simpson undoubtedly had the power to sell or lease its property, control access to its property, to shut down the facilities, etc. However, the statute speaks of "control over the manner in which the work is performed." TEX. CIV. PRAC. & REM.CODE ANN. § 95.003 (Vernon 1997). While the summary judgment evidence shows Simpson purged the line with water in an attempt to eliminate any hazard to Carter and Dyall, the success or failure of this procedure does not demonstrate "control over the manner in which the work is performed." *Id.* Dyall plainly acknowledged in his deposition that Simpson did not exercise any control over his work.[17] Likewise, Carter testified, "Simpson never advised us on how to perform our job, as far as how to lay it up, how to glass it or how to Hydro-plug it."

Simpson personnel were fully capable of repairing the leak by shutting down the pine bleaching plant and replacing the cracked flange on an empty pipe. They were not competent, however, to repair the crack without replacing the entire flange while the pipe was dribbling liquid, and that is precisely why Simpson sought the expertise of an independent contractor.

17. Dyall testified:

Q. Would it be fair to say that the gentleman that showed you where the area [of the leak] was didn't tell you how to do the *repair work*?
A. No.
Q. That's not fair?
A. He didn't tell us how to do the repair work.
Q. That's why you guys were out there?
A. Right.
Q. Because y'all are, I guess, the experts in fixing this type of work?

A. Yes.
Q. You're supposed to be?
A. I guess.
Q. That's why you're there?
A. Right.
Q. And that's what you and Joey [Carter] were out there for?
A. Right.
Q. And would it be fair to say that the entire time that you were at the Simpson plant that no Simpson people told you or Joey *how to fix that flange?*
A. To my recollection, no.

Carter apparently thought he could seal the crack without replacing the flange. He further testified that it was solely his responsibility to assess the hazards before commencing a project, and the record reflects the only inquiry Carter made regarding protective equipment was whether he and Dyall needed to wear boots. Moreover, Carter testified that he and Dyall had all the personal protection equipment they needed for this task on the truck—they simply chose not to use their respirators until they began feeling ill. Accordingly, we find no evidence of control over the manner in which the work was performed.

■■■ Dyall next claims that Simpson exercised "control" by providing safety equipment, *i.e.*, emergency escape respirators. It is undisputed that a Simpson safety officer insisted that Carter and Dyall carry escape respirators on their belts before entering the pine bleaching plant area. Admittedly, this is some "control" over safety procedures, and where an employer imposes a safety regulation that causes or leads to injury, the employer's control over the manner of work may lead to its liability for the injury. In short, safety regulations imposed by the employer must not increase the probability of injury. *Hoechst–Celanese Corp. v. Mendez*, 967 S.W.2d 354, 358 (Tex.1998). Here, however, Dyall does not allege that he was injured by Simpson's insistence that he carry an escape respirator on his belt, and the mere existence of safety regulations does not establish actual control over an independent contractor. *Dow Chem. Co.*, 89 S.W.3d at 611. In other words, employers can set minimal safety standards without incurring liability. *Hoechst–Celanese Corp.*, 967 S.W.2d at 358. Those who employ independent contractors are not "required to stand idly by while another is injured or killed in order to avoid liability." *Welch v. McDougal*, 876 S.W.2d 218, 224 (Tex.App.-Amarillo 1994, writ denied). Moreover, a premises owner does not incur a duty to an independent contractor to intervene and ensure he safely performs his work merely by placing a safety employee at the work site. *Koch Ref. Co.*, 11 S.W.3d at 157.

■ Dyall also alleges Simpson exercised "control" "by instructing [him] the safety equipment provided was unnecessary." The record, however, does not support Dyall's allegation. Dyall cites to two places in the summary judgment record he contends support his assertion. In the first instance, Carter testified:

Q. You knew that everybody that entered over there had to have an escape respirator? Did you know that?

A. Yes.

Q. And so whoever it was, Elleven or whoever, issued escape respirators?

A. Yes. And at that point I let him know—I informed him we had our own half-face that we used.

Q. And whoever it was, what did they say?

A. "Just go ahead and keep it until you finish and turn it back in before you leave."

Q. And that's an escape respirator that you put on your belt?

A. On your belt.

Q. And, for example, if you're driving out there and a pipe pops and starts spraying, you put the escape respirator on your mouth and you run, right?

A. Right.

Q. That's what it's for?

A. Correct. For escapes only.

Nothing in Carter's testimony suggests that Simpson implied, suggested, or hinted that Carter and Dyall should not use their

half-face respirators while conducting repairs on the leaking flange.

Dyall next cites his own testimony where he said:

Q. What else do you recall about that conversation with this male inside the building?

A. He asked us if we had full air packs. Joey [Carter] said, "Back at the shop." He said, "Well, that's all right. I don't think you'll need them." He said, "Go to the safety guy here and he'll give you these throw-down packs," and we went over there and they issued us two throw-down packs. We hooked them on our belts and proceeded over to where the leak was.

\* \* \*

Q. And y'all had full air packs—

A. I don't know that we had them. Joey said we had them back at the shop locked up.

Q. And the man at—that was inside the building said what?

A. He said, "I don't think you'll need them anyway. We'll—I'll just give you some of our packs here," and he took us to the safety guy which issued us two.

Q. Who was the safety—

A. I don't know his name either. He just was—he said, "This is our safety."

Q. So he gave—strike that. The man that you met gave you two what?

A. Air packs is all I know them called by, the little thing you put in your mouth, put a clip on your nose.

Q. So you put a clip on your nose and you had this other—

A. If you need it. We didn't do that. We had them clipped to our belts.

\* \* \*

Q. ... Would it be fair to say that when you received these two air packs it was your understanding that they were

to protect you and Joey from chemical exposure?

A. I didn't know they had any chemicals out there so I couldn't say that either. He said, you know—I mean, we had respirators, but he gave us these.

Q. You had respirators?

A. Yes.

Q. Where?

A. In the truck with us.

Q. Okay. So when you and Joey arrived at the Simpson plant, you had your respirator and he had his respirator?

A. In our safety bag in the truck, yes.

\* \* \*

Q. And you had those in the truck?

A. Yes, we did.

Q. Any you guys left them in the truck?

A. Left in the truck.

Dyall's theory seems to be that but for Simpson's insistence that he and Carter clip emergency escape respirators to their belts, they might have worn their half-face respirators while attempting to repair the leaking flange.

The record, however, does not logically support Dyall's contention. The summary judgment evidence shows there were three possible means of protecting Carter and Dyall. The first, and best method, was an air pack with a full face shield. Carter and Dyall had access to this equipment, but did not bring it with them to the job site. Contrary to appellant's position, Elleven's question, by its nature, suggests it might have been advisable to have such equipment. When he learned that Carter and Dyall did not have the equipment with them, he allegedly said, "Well, that's all right. I don't *think* you'll need them." (emphasis added). This statement is ambivalent on its face and cannot reasonably be construed as a command or instruction

not to use such equipment. In fact, it suggests the possibility that full air packs *might* potentially be needed depending upon the circumstances. Moreover, the summary judgment record shows that at one point, Carter and Dyall left the Simpson job site, returned to their shop to pick up parts, but still did not pick up the full air packs.

The second level of protection was a respirator covering the lower half of the face. Carter and Dyall were in possession of respirators and goggles, but chose not to use the respirators until after they both became ill. At no time did any Simpson employee order, command, instruct, or suggest that Carter and Dyall should not use their respirators.

The third level of protection available to Carter and Dyall was an emergency "throw-down" pack or escape respirator. As the record makes clear, the requirement of an escape respirator was a minimal safety precaution. Nothing about the requirement of an escape respirator precludes the use of other safety equipment. On many construction sites, for example, hard hats are required of all visitors as a safety precaution, but few would argue that such a requirement prevents contractors from utilizing other protective equipment such as gloves, safety harnesses, steel-toed boots, safety glasses, etc. that they in their judgment deem advisable or necessary to safely complete their task.

Dyall argues that because Simpson insisted he carry an emergency escape respirator, he assumed he was in no danger of exposure to toxic fumes. However, notwithstanding Dyall's testimony that he did not know why he was required to carry an escape respirator, the very fact that Simpson insisted that he carry such a device indicates the site was potentially hazardous. Using the analogy of a hard hat, if Simpson had insisted that Dyall wear a hard hat, he could not reasonably assume there was no danger of falling objects or that he could walk under ladders with impunity. To the contrary, the requirement of a hard hat indicates that falling objects are a potential hazard. In a similar manner, the requirement that all visitors carry a back-up or emergency respirator puts every reasonable person on notice that toxic vapors constitute a potential hazard.

Dyall next argues that Simpson exercised "control" by refusing "to allow Dyall to return to the IPP office and retrieve the proper safety equipment," *i.e.,* full air packs. This allegation, however, is a gross distortion of the record. To support his contention, Dyall cites the testimony of his expert witness who, when asked if it would have cost Simpson money to have a delay in repairing the leak said, "Well, I can't answer 'yes' or 'no' absolutely, but obviously if they have to shut down the process they've cost some money." From this conjecture Dyall asks us to imply that Simpson discouraged Carter and Dyall from returning to the IPP office to get full air packs. However, there is absolutely no evidence in the summary judgment record that Carter or Dyall were ever discouraged from returning to their shop to get full air packs. In fact, Carter testified that he was told by Simpson employees to "be careful and don't rush ... [t]ake your time, get it fixed. Get it done right."

Dyall next contends that Simpson exercised control by directing him "to use a 'throw-down' pack and providing the same." As we have already observed, Simpson never directed Dyall to "use" a throw-down pack in lieu of his half-face respirator. *All* persons entering the area of the pine bleaching plant were required to carry an emergency escape respirator as a minimal safety precaution. The device is not designed for sustained use, and

it is uncontroverted that Simpson did not supply the throw-down packs for Carter and Dyall to use while performing repairs to the leaking flange. Carter and Dyall testified that before leaving Simpson's facility, they returned the unused emergency respirators. This is consistent with the uncontroverted testimony of Stiles, Carter, and Dyall that the throw-packs were a safety precaution, not an element of control in how Carter and Dyall should perform their work or what type of protection they should use.

■ Dyall next asserts Simpson exercised control by twice assuring him "it was safe to continue working without [a] full face mask air respirator." Although he contends he was "twice reassured," Dyall cites only the one statement by Elleven that he did not think Carter and Dyall would need full air packs to repair the flange. Carter frankly admitted that Simpson never said the area around the leaking flange was "safe." Thus, Dyall could only say Simpson *implied* the area was safe by the fact that Simpson employees, who were working in the same area, were not using respirators or air packs. Moreover, Elleven's comment did not suggest that Carter and Dyall should not use their half-face respirators and goggles, but, at most, indicated they would probably not need full air packs.

■ Dyall next claims Simpson exercised control by authorizing him to enter the pine bleaching plant to repair the leaking flange. We fail to see how this constitutes any type of control over the manner in which the work was to be performed.

■ Dyall next maintains Simpson exercised control by "failing to provide a safe work place and environment." Section 95.003, however, expressly states that "the failure to provide a safe workplace" is not actionable unless "the property owner exercises or retains some control over the manner in which the work is performed" and "had actual knowledge of the danger or condition resulting in the personal injury ... and failed to adequately warn." TEX. CIV. PRAC. & REM.CODE ANN. § 95.003 (Vernon 1997). Dyall would have us interpret the statute to say that "control" is established, *ipso facto*, by the property owner's failure to provide a safe workplace. We are not inclined to accept Dyall's interpretation because it would render the statute meaningless.

■ Dyall next alleges that Simpson exercised control by not warning him that he would be exposed to chlorine dioxide. Again, however, the statute provides immunity from suit unless the property owner (1) controlled the work and (2) knew of the danger and *failed to adequately warn*. TEX. CIV. PRAC. & REM.CODE ANN. § 95.003 (Vernon 1997). Thus, the statute, on its face, suggests that the failure to warn is not synonymous with "control." Moreover, Carter and Dyall both testified that Simpson might have told them chlorine dioxide was in the pipe.

■ Dyall next contends Simpson exercised control "by failing to shut the facility down at the request of the shift supervisor for the bleach plant facility." First, this allegation misconstrues the record. The record shows that Bruce Stiles, the shift supervisor, ordered the pine bleaching plant to shut down when the leak was first discovered. The bleaching facility was shut down and the line was then purged with water and the area around the leak was scrubbed down. When, on the following day, Carter and Dyall arrived to repair the flange, the pine bleaching plant was back in operation. The record does not explain how the plant resumed operation without chlorine dioxide or whether the supply of chlorine dioxide had been rerouted. In any event, it is undisputed that

Simpson believed the pipe which Carter and Dyall were hired to repair was dribbling water that potentially contained only trace amounts of chlorine dioxide that did not present a respiratory hazard to those working in the area. Carter and Dyall were specifically asked if they could repair the leaking flange while it was still dribbling. When it became apparent they could not repair the flange, the pine bleaching plant was again shut down to allow Simpson personnel to replace the cracked flange. Thus, there is nothing in the record to suggest that Simpson disregarded the orders of its own shift supervisor.

Second, even if Dyall's allegation were true, we fail to see how Simpson's internal decision to operate or shut down the pine bleaching plant can be characterized as "control over the manner in which the work is performed." TEX. CIV. PRAC. & REM.CODE ANN. § 95.003 (Vernon 1997). Carter and Dyall were asked if they could repair the pipe while the pine bleaching plant was in operation and the pipe was dribbling. Carter and Dyall thought they could, but as it turned out, they could not. It was Carter's and Dyall's decision whether or not to attempt a repair of the pipe while it was leaking. This decision cannot be characterized as "control" by Simpson.

■ Dyall next asserts Simpson exercised control "by failing to adhere to its own safety policies and provide [him] full face safety equipment or (at least advise it was necessary)." Dyall cites to numerous places in the record reflecting that Simpson employees worked within five feet of Carter and Dyall without the benefit of respirators or full air packs. Nothing in the record before us indicates the Simpson employees violated their own safety policies by working in the area. However, even if Simpson employees had violated their own safety policies, Dyall does not explain how this act could reasonably be construed as control over the manner in which Carter and Dyall performed their work.

■ Dyall next contends Simpson exercised control "by supervising the manner in which Dyall attempted to repair the leaking flange." First, the record indicates Dyall never attempted to repair the leaking flange. Carter testified that as his helper, Dyall merely fetched tools and mixed-up the Hydro-plug compound for him. Carter, alone, attempted to repair the flange by applying the Hydro-plug mixture to the site of the leak. Second, while Bruce Stiles dropped by from time-to-time to check on their progress, Carter and Dyall both testified that Stiles did not control their work or activities in any manner. Accordingly, Dyall's contention has no support in the record.

■ Dyall next proposes that Simpson exercised control "by giving clearance to [him], after a second leak, to continue working in an area leaking toxic chemicals." Again, this characterization of the facts is a distortion of the record. During the course of his work on the flange, Carter noticed a drop of odorless liquid fall to the ground every ten or fifteen seconds a short distance from where he was working. Carter asked Simpson employees working in the area, "Is it the same thing or is it something else?" A Simpson employee determined the leak was from the same pipe Carter was already working on and said, "Oh, it's all in—it's the same pipe." Carter testified that he was never told by Simpson employees that the area had been cleared as or declared to be "safe." In fact, both Carter and Dyall admitted that Simpson employees may have told them the liquid dripping from the pipe could contain chlorine dioxide. In fact, it is hard to conceive how Carter and Dyall could be ignorant of the *potential* danger: (1) they

were specifically asked whether they had full air packs; (2) they were required to carry emergency escape respirators on their belts; (3) they were warned to leave the area immediately if they noticed any odors; and (4) they were within twenty-five feet of a sign warning of the respiratory danger presented by chlorine dioxide. Dyall could, of course, make an argument that these warnings were not adequate to apprise him of the danger. However, the adequacy of a warning relates not to the element of control, but to the second prong of Section 95.003 relating to whether the property owner had actual knowledge of the danger and failed to warn. TEX. CIV. PRAC. & REM.CODE ANN. § 95.003 (Vernon 1997).

■ Dyall next argues that Simpson exercised control "by allowing [him] to continue work on leaking chlorine dioxide without a face shield, goggles and without respirators." This is simply another way of saying Simpson exercised control by not exercising control. The record reflects Carter and Dyall wore goggles and gloves during the attempted repairs. They had respirators in their truck, but chose not to use them. Carter admitted they should have worn their respirators if only to protect them from the fumes of their own Hydro-plug mixture, but did not do so.

■ Dyall next claims Simpson exercised control "by failing to shut-down and clear the area of the facility leaking toxic chemicals, as required by Simpson's safety procedures." Dyall cites the testimony of Paul Licata, an environmental and safety manager for Simpson. Licata testified that a person working in the vicinity of a chlorine dioxide leak should have respiratory protection. However, he also testified that it is virtually impossible for a person to remain in the vicinity of a chlorine dioxide leak due to its pungent odor and irritability. Licata did not testify, as Dyall seems to suggest, that Simpson had an internal policy requiring the shut-down and evacuation of the facility where an odorless solution containing only traces of chlorine dioxide is discovered to be leaking.

■ Finally, Dyall contends Simpson exercised control "by breaching its responsibility to discuss general hazards with contractors." Dyall again cites the testimony of Paul Licata who stated it was Simpson's responsibility to discuss general hazards with contractors including exposure to chlorine dioxide water. As noted earlier, Carter and Dyall could not recall whether they were advised by Simpson that the substance leaking from the broken flange possibly contained trace amounts of chlorine dioxide. However, even if Simpson did not properly apprise Carter and Dyall of the danger and, thus, breached a duty to them, we fail to see how such breach constitutes "control." The breach of a duty leading to a cause of action for negligence is the subject of Chapter 95 of the Texas Civil Practice and Remedies Code. This provision states that claims "for damages caused by negligence" are not viable against a property owner unless he exercised or retained control and had actual knowledge of the danger without adequately warning the injured party. TEX. CIV. PRAC. & REM.CODE ANN. §§ 95.001(1) & 95.003 (Vernon 1997). Thus, breach of a duty is not equivalent to "control."

After considering all of Dyall's proposed examples of evidence of "control," we find none can reasonably be characterized as "control over the manner in which the work is performed." *Id.* at § 95.003 (Vernon 1997).

## LEGISLATIVE INTENT

Even if the summary judgment proof fails to satisfy the plain wording of Section

95.003, Dyall contends the legislature never intended the statute to apply to a scenario like the one presented here. Dyall relies on a statement of legislative intent made by the bill's sponsor, Representative Robert Junell:

It is the legislative intent of the authors that Chapter 95, Property Owner's Liability for Acts of Independent Contractors and Amount of Recovery, does not apply nor raise the burden of proof in situations where a property owner is negligent, separate and apart from exercising or retaining control over the manner in which the work is performed in a contract to construct, repair, renovate or modify an improvement to real property.

Example: Let's say there is a concrete company supplying concrete to a plant and because of premise owner's negligence (such as failing to properly maintain their pipelines, vessels or pressures), there is an explosion destroying the concrete truck and injuring the driver. Nothing in this Chapter would raise the burden of proof on the property owners negligence for recovery of the damages related to the truck or person.

Example: Likewise, if we have a maintenance contractor who gets a contract to perform work at the plant, and the property owner informs the contractor that the lines are clear and ready for welding, when in fact they are not, due to the property owner's negligence, and an employee of the maintenance contractor is injured by the release of chemicals. Nothing in this chapter would change the burden of proof or the damages recoverable.

H.J. of Tex., 74th Leg., R.S. 2611–12 (1995).

The statement of legislative intent, however, does not support Dyall's contention. First, when a statute is clear and unambiguous, we need not resort to extrinsic aids to construe it. *St. Luke's Episcopal Hosp. v. Agbor,* 952 S.W.2d 503, 505 (Tex.1997); *Bridgestone/Firestone, Inc. v. Glyn–Jones,* 878 S.W.2d 132, 133 (Tex.1994). Dyall has made no argument that Section 95.003 is ambiguous. Accordingly, in determining the legislative intent behind Chapter 95 of the Texas Civil Practice and Remedies Code, we look solely at the plain and common meaning of the words of the statute. *Monsanto Co. v. Cornerstones Mun. Util. Dist.,* 865 S.W.2d 937, 939 (Tex.1993); *Moreno v. Sterling Drug, Inc.,* 787 S.W.2d 348, 352 (Tex.1990).

Second, even if we were to rely on the author's stated intent, we fail to see how Representative Junell's explanation of the statute differs from the plain meaning of the words used therein. If Dyall had been injured by an unrelated explosion of the pine bleaching plant due to Simpson's negligence, the statute would not preclude recovery. Likewise, if Simpson had negligently told Carter and Dyall that the pipe was empty, and Dyall had been injured due to his reliance on that statement, again the statute would not preclude recovery. However, neither scenario is presented here. In fact, the summary judgment evidence shows just the opposite.

Carter and Dyall were specifically told the pipe was *not* empty. Even before starting their repair work, Carter and Dyall could plainly see a liquid dripping from the flange. Likewise, Carter admitted that a Simpson employee may have told them the liquid contained chlorine dioxide. Moreover, the leak was within 25 feet of a sign warning of the presence of chlorine dioxide and recommending the use of chemical goggles, face shield, and respirator. Finally, we do not interpret a statement by a Simpson employee that the men might not need full air packs as an instruction or directive that they should proceed without the benefit of such packs.

To the contrary, the only specific instruction Simpson gave to Dyall and Carter regarding their manner of work was to be careful and take the time necessary to get the job done right.

### KNOWLEDGE OF THE DANGER

■ Finally, Dyall suggests that because Simpson was aware of the danger and failed to adequately warn of the same, it necessarily exercised "control" over the manner in which the work was performed. Dyall states in his appellate brief, for example, that Simpson exercised control because it "owed [him] a duty to provide a safe work place, but did not warn [him] of the known danger of exposure." In support of his position, Dyall relies heavily on the testimony of Dr. Frank Stevens, his expert witness. Dr. Stevens testified that in his opinion Simpson exercised control of the "situation." But when asked for the basis of his opinion, Dr. Stevens was quite vague:

> Well, first of all, they're the ones that call IPP out to say, "Here's a project that we need to be performed," and all—and, you know, here's where—here's where it is, and—and it's implied that, you know, they took responsibility to make sure that the lines are purged and, you know, that's—that's part of their control.

Thus, it seems Dr. Stevens was of the opinion that "control" is established merely by soliciting the services of an independent contractor and directing him to the problem he is to fix or repair. Interestingly, when shown Chapter 95 of the Texas Civil Practice and Remedies Code, Dr. Stevens said it was the first time he had ever read the statute and that he had never heard of Chapter 95 until it was mentioned by Dyall's attorney a few hours before the deposition.

Nevertheless, Dyall argues that because Simpson knew the chemical leaking from the broken flange might contain trace amounts of chlorine dioxide, it necessarily exercised "control" over the work by not advising him of the hazards of working on the flange without respiratory protection. We disagree.

The first problem with Dyall's position is that it effectively repeals Chapter 95. Dyall would have us hold that the element of "control" can be supplied by proof of "knowledge." This, of course, would eliminate the first prong of the statute.

■ The second problem with Dyall's position is that he presented no evidence of "knowledge." Thus, even if his interpretation of the statute could be harmonized with the plain wording of Chapter 95, there is no evidence in the summary judgment record to show Simpson had *actual* knowledge of the danger from which control could be inferred.[18]

Simpson moved for summary judgment only on the ground that it exercised no control, not that it lacked knowledge of the danger. Thus, we would ordinarily restrict our analysis solely to evidence of control. However, Dyall's contention is that Simpson exercised "control" by failing to warn him of the danger posed by chlorine dioxide. When, as here, the contention is made that proof of "knowledge" satisfies the requirement of "control," the plaintiff is logically obliged to offer some evidence of "knowledge."[19] Dyall, howev-

---

18. As this Court observed in *Bishop v. Nabisco, Inc.*, No. 14–03–00639–CV, 2004 WL 832916, at *3 (Tex.App.-Houston [14th Dist.] Apr. 20, 2004, no pet. h.), knowledge that an activity is potentially dangerous is not suffi-

cient to satisfy the second prong of Section 95.003—actual knowledge of the danger is required.

19. While Dyall's assertion that the element of "control" can be satisfied by proof of "knowl-

er, produced no summary judgment evidence to show either Simpson's "control" over the work or its "knowledge" of the danger.

The summary judgment evidence shows Simpson was aware that pure chlorine dioxide was being pumped through the pipe when the leak was first discovered. The line was then shut down for a day and purged with water. Thereafter, the liquid dribbling from the line had no chlorine odor, and Simpson employees believed it to be virtually pure water that presented no respiratory hazard.[20] In fact, Simpson employees worked within five to ten feet of Carter and Dyall without protective equipment. Moreover, when Carter and Dyall were unable to repair the leaking flange, Simpson employees ultimately replaced it without the benefit of protective equipment. Nothing, therefore, in the record before us suggests Simpson was aware of the danger and knowingly exposed Carter and Dyall to chlorine dioxide.

Accordingly, we find no merit in appellants' contentions; thus, summary judgment was properly granted for Simpson based upon section 95.003(1).

### COMMON-LAW NEGLIGENCE

■ In the alternative, Dyall contends the trial court erred in granting summary judgment because Chapter 95 is not applicable to his claim for damages arising out of common-law negligence.

Such an argument belies the clear language of the statute. A property owner is entitled to the defense provided by Chapter 95 for claims "for damages caused by negligence." TEX. CIV. PRAC. & REM.CODE ANN. § 95.001(1) (Vernon 1997); see also Kelly, 27 S.W.3d at 569 (applying Chapter 95 to assertions of negligence, negligence per se, res ipsa loquitur, and negligent misrepresentation). No distinction is made for negligence claims arising under common law. Accordingly, Dyall was required to surmount the defense provided by Chapter 95 as to all of his claims that sounded in negligence.

The judgment of the trial court is affirmed.

Chief Justice HEDGES, Justices ANDERSON, EDELMAN, FROST, and GUZMAN join this opinion.

Justice FOWLER authored a dissenting opinion in which Justices YATES and SEYMORE join.

WANDA McKEE FOWLER, Justice, dissenting on en banc rehearing in which Justices YATES and SEYMORE join.

### INTRODUCTION

I respectfully dissent. The majority's reasoning is flawed in four ways, all of which lead the majority to the wrong conclusion.

---

edge" is erroneous, we simply observe that his own theory of prosecution requires him to produce evidence of "knowledge."

**20.** It is common knowledge that chlorine is highly toxic. *City of Jackson v. Ball*, 562 So.2d 1267, 1269 (Miss.1990). In fact, it has been used as a chemical warfare agent. *Valentine v. Pioneer Chlor Alkali Co., Inc.*, 921 F.Supp. 666, 673 (D.Nev.1996). However, the odor of chlorine is identifiable by most persons because chlorine is used so commonly as a disinfecting agent in drinking water

and swimming pools, and it is the active ingredient in many household bleaches, general germicides, and deodorants. *See United States v. FMC Corp.*, 306 F.Supp. 1106, 1111 (D.Pa.1969); *Erbrich Products Co., Inc. v. Wills*, 509 N.E.2d 850, 856 (Ind.App. 1st Dist. 1987). Where, as here, the odor of chlorine was not present in the liquid leaking from the flange, Simpson employees assumed that any chlorine dioxide residue in the liquid was so minuscule as to present no toxic hazard.

The first two problems relate to the nature of this appeal, an appeal of a summary judgment. First, the majority improperly expands the scope of the motion to include knowledge of a dangerous condition, even though the motion was based only on control over the work being performed. Second, the majority applies the wrong standard of review. Instead of looking at the evidence in the light most favorable to Dyall, the non-movant, the majority views the evidence in the light most unfavorable to Dyall.

The third and fourth problems stem from the majority's reliance on legislative history to conclude that the scope of section 95.003 is so narrow it excludes all safety issues—even when a premises owner at a plant with dangerous chemicals informs a maintenance worker that he can proceed safely with his work without any breathing equipment. This conclusion directly contradicts the plain wording of the statute and one of the two examples the sponsoring senator gave to illustrate what situations the section does not cover.

If these problems are avoided, and the evidence is viewed in the appropriate light, we find the following. More than a scintilla of evidence shows that the Simpson employees knew the plant and the chemicals in it and understood when protective breathing equipment should be worn. More than a scintilla of evidence shows that Dyall and Carter did not know the plant well and were uncertain if they needed protective breathing equipment. More than a scintilla of evidence shows that Simpson employees discussed with Dyall and Carter their need for protective breathing equipment. And more than a scintilla of evidence shows that Simpson employees advised Dyall and Carter that they did not need protective breathing equipment.

For these reasons, the majority errs in concluding that no fact issue exists on the control prong of section 95.003.

## I. THIS IS AN APPEAL OF A SUMMARY JUDGMENT, WHICH MEANS THAT OUR REVIEW IS SUBJECT TO RESTRICTIONS.

### A. A Summary Judgment Is Subject to a Particular Scrutiny.

As noted earlier, this appeal reached our court by way of a summary judgment. When a summary judgment arrives on our doorstep, it is subject to a great deal of scrutiny. We scrutinize the facts in the light most favorable to the non-movant. *See Nixon v. Mr. Prop. Mgmt.*, 690 S.W.2d 546, 548–49 (Tex.1985). We scrutinize the facts to see if the non-movant's claims create at least a scintilla of evidence creating a fact issue. *Id.* We scrutinize the motion and the grounds contained in it to ensure that only the grounds contained in the motion are the basis of the summary judgment. *See McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 339–41 (Tex.1993).

### B. Simpson's Motion Was Limited to One Ground.

Simpson brought its motion for summary judgment on only one ground: lack of control. Simpson alleged that it exercised no control over Dyall's and Carter's work, pointing out that it never advised Dyall and Carter how to do their welding. Simpson carefully chose its summary judgment evidence, presenting only evidence to show that Simpson did not tell Dyall and Carter how to weld. One excerpt from Simpson's motion clearly illustrates the company's focus in the motion:

Q. Would it be fair to say the gentleman [at Simpson] that showed you where the area was didn't tell you how to do the repair work?

\* \* \* \* \* \*

A. He didn't tell us how to do the repair work.

Q. That's why you guys were out there?

A. Right.

Q. Because y'all are, I guess, experts in fixing this type of work?

A. Right.

    \*     \*     \*     \*     \*     \*

Q. Would it be fair to say that in the entire time you were at the Simpson plant no Simpson people told you . . . how to fix that flange?

A. To my recollection, no.

Nothing in the motion mentioned the second element of section 95.003: knowledge of a dangerous condition.

**C. The Majority Opinion Improperly Injected the Second Prong, Knowledge of a Dangerous Condition, into its Review.**

**1. The majority's statement of facts highlights Simpson's lack of knowledge and Dyall's knowledge that chlorine dioxide was in the pipe.**

The majority admits that it addresses knowledge, stating, ". . . we would ordinarily restrict our analysis solely to evidence of control. . . ." Nowhere is its focus on knowledge more evident than in its factual statement of the case. There, the majority goes into great detail regarding the Simpson employees' knowledge and Dyall's and Carter's knowledge concerning the pipe's contents and what Dyall and Carter should have known concerning the pipe's contents. The thrust of this statement of facts is fourfold: 1) to show that Simpson thought it had cleared the pipe of chlorine dioxide; 2) to show that chlorine dioxide has an unusual odor and therefore Dyall and Carter would have known to wear masks if chlorine dioxide were present; 3) to show that signs near the pipe warned Dyall and Carter that the pipes contained chlorine dioxide; and 4) to show that Simpson employees did not tell Dyall and Carter that they should or should not wear protective breathing equipment.

Simpson discussed none of these facts in its summary judgment motion. Simpson did not mention them because its sole focus was that it did not control how Dyall and Carter welded.

**2. The majority opinion should not have focused on actual knowledge because Simpson's motion mentioned only control.**

For several reasons, the majority errs when it injects actual knowledge into its review of the case. The first reason is this: a movant can obtain a summary judgment only on the grounds it discusses in its motion for summary judgment. *Id.* The purpose of the motion is to notify the non-movant of the issues he must address. If a case involves more than one issue, and one of them clearly is not discussed in the motion, the non-movant need not address that issue and need not except to the motion as being vague. *Id.* at 342. Simpson's motion clearly did not address the knowledge prong of section 95.003.

The second reason the majority errs relates to the first. When a non-movant knows what issues are involved in the motion for summary judgment, he gathers the evidence responsive to those issues and presents it to the trial court. Generally, the non-movant presents evidence relating only to the issues contained in the motion, and does not present evidence related to other issues. The evidence may contain some overlap of issues but, generally, the focus is on the issue challenged in the summary judgment motion. This record generally supports that theory. A review of the deposition excerpts attached to the response to the motion for summary judgment reveals that the testimony relates

primarily to control and not to knowledge. It would be inappropriate to assume that Dyall has presented all of his evidence related to knowledge and to hold against him based on that assumption. If anything, we should assume that Dyall has not presented all of his evidence on knowledge.

Third, even though Dyall may have argued in parts of his response that Simpson knew the pipe was not completely clear, that does not enlarge the scope of the motion. The rule is quite clear. A summary judgment may be granted only on the specific issues presented in the motion. *See* Tex.R. Civ. P. 166a; *McConnell,* 858 S.W.2d at 339.

Fourth, Dyall did not base his claim of control on Simpson's knowledge of what was in the pipe. Quoting from his summary judgment response, he claims "[Simpson] exercised control over the manner in which the job was done, safety-wise, by telling Mr. Dyall and Mr. Carter that they did not need to return to their shop to get a full-face air tank respirator to work on the leak." In addition, Dyall included in the body of his response excerpts from the depositions of Simpson employees; these excerpts support a claim that Simpson employees felt it their duty to ensure that contractors wore the right protective gear for the job they performed, and that some of the employees advised Dyall and Carter on the necessity of wearing protective breathing equipment.

Thus, the motion was limited to control, Dyall presented evidence responding to the specific claim of control—he did not rely on knowledge to defeat the summary judgment—and even if Dyall did discuss knowledge in his response to the motion, the motion controls what grounds can form the basis of the judgment.

## D. The Majority Opinion Looks at the Evidence in the Light Most Negative to Dyall.

The second problem with the majority opinion is that it does not view the evidence in the appropriate light. It generally discounts Dyall's testimony and views the evidence in the light most negative to Dyall. Several examples underscore this point.

First of all, the majority refuses to acknowledge that Dyall and Carter did not know what chemicals they might encounter at the plant and did not know if they needed protective gear. The record supports an inference that Dyall and Carter were relying on the Simpson employees to tell them if they should wear protective breathing equipment. The record does not conclusively show that Dyall and Carter knew that they were to work on a pipe that had contained chlorine dioxide and might still contain some residue of that substance. The majority reaches the conclusion—without support from the record—that chlorine dioxide has such a distinct odor anyone would be able to recognize it. Yet, a Simpson employee acknowledged on the record that the plant has many strong odors and a person unfamiliar with the plant might not be able to discern the chlorine dioxide among the other noxious odors: [1]

Q. That's my point. In the sense that you may know it's a bad odor, but unless you've worked around it, you can't specifically identify what that specific odor was; is that correct?

A. Absolutely. I don't think you would know what it was.

Q. So, basically, if it's your first or second time into that facility, would you say there are a lot of new odors, if you've never been in a paper mill

---

1. Dyall testified that he had been to the plant on only one or two prior occasions.

before, that a general person in the general population would not be familiar with?

A. Yes.

Next, the majority reviews an encounter between Dyall and Carter and Elleven, the Simpson employee in charge of giving Dyall and Carter their work orders. Upon finding out that Dyall and Carter did not have their air packs with them, Elleven responded, "Well that's all right. I don't think you'll need them." Rather than viewing this as some evidence of a Simpson employee telling Dyall and Carter that they could work safely without protective breathing equipment, the majority calls the statement "ambivalent:" "This statement is ambivalent on its face and cannot reasonably be construed as a command or instruction not to use such equipment." It may not have been a command, but reasonable minds could reach different conclusions on whether this statement amounted to advice from someone who was more knowledgeable about the plant's chemicals. More importantly, the statute does not require a command; it merely requires some level of control that is more than ordering the start and stop of work. TEX. CIV. PRAC. & REM.CODE § 95.003(1).

Later, the majority again refuses to make any reasonable inferences in favor of Dyall. This occasion concerns Dyall's claim that Simpson employees exercised control by telling Dyall he need not be concerned about a second leak that sprang from the pipe on which Dyall and Carter worked.

While Dyall and Carter worked on the pipe, they detected a foul odor and reported it to Simpson operations employees, who checked the area where Dyall and Carter worked. Either before or after the Simpson employees arrived to check on the odor, Dyall and Carter noticed a new leak other than the one they were repairing. Carter explained:

> When I talked to the guy and told him about the leak, I said, you know, "Is it all the same thing or is it something else?" He came over and he looked, he goes, "Oh, it's all in—it's the same pipe." I said, "Oh Okay." He said, "But other than that," he goes, "I don't see anything that would cause an odor which, you know, y'all are speaking of."

Two reasonable inferences flow from this testimony: (1) Carter wanted to know if he could safely work around the leak and (2) Simpson employees led Dyall and Carter to believe that they could continue working safely without protective breathing equipment. Dyall and Carter clearly asked the employees about the odor and leak because they did not know what substance was leaking from the pipe and wondered if they should continue their work.[2] Yet, the majority uses this testimony as a springboard to conclude that Carter and Simpson should have known they might encounter chlorine dioxide because of signs at the plant warning of chlorine dioxide, and that they should have known in any event when to wear protective breathing devices and what type they should wear. This was wrong.

2. The majority concludes it would be ludicrous to hold that Simpson exercised control because Simpson employees told Dyall and Carter it was safe for them to work; it concludes this would be tantamount to exercising control by not exercising control. I beg to differ. In a paper mill or a chemical plant, deciding whether work can be done safely is of paramount importance. Deciding that protective breathing equipment does not need to be worn is as much of a decision as deciding that protective breathing equipment needs to be worn. Control is exercised in both decisions.

Thus, the majority's review of the statement of facts and its conclusions based on the statement of facts are flawed because it (1) injects an issue not contained in the motion for summary judgment and (2) looks at the evidence in the light most unfavorable to Dyall. That is error.

## II. THE MAJORITY RELIES ON LEGISLATIVE HISTORY TO UNDERGIRD ITS HOLDING THAT DYALL HAS NOT CREATED A FACT ISSUE ON CONTROL. HOLDING THAT DYALL DID CREATE A FACT ISSUE DOES NOT OFFEND THE PLAIN LANGUAGE OF THE STATUTE OR THE LEGISLATIVE HISTORY.

The majority expends five pages explaining the history of the movement from a broad imposition of liability on landowners to a narrower one. It uses this history to undergird and justify its holding that Dyall has not created a fact issue on control. However, concluding that Dyall did create a fact issue on control does not offend the plain language of the statute or the legislative history. Because the motion was based on control, our review must consider what that word means and whether it can encompass advising Dyall whether he should use protective breathing equipment.

### A. The Statute's Definition of Control Does Not Exclude this Case.

The statute defines control broadly. Although it does not contain a true definition of "control," it does give some direction as to what "control" means. The direction comes in two parts, the first part stating what "control" is, the second part stating what it is not. First, the statute states what control is: direction in the "manner in which the work is performed." TEX. CIV. PRAC. & REM.CODE § 95.003(1). Then it states what control is not: "the right to order the work to start or stop or to inspect progress or receive reports." *Id.*

So, if a property owner takes some action to direct how subcontractors perform their job and the action is more than simply telling them when to start and stop their work, or inspecting their work or receiving reports on the work, that action can qualify as some control.

It appears the Legislature has said that simple decisions unconnected with how the job is done, such as when workers will start and stop work each day or on particular days, do not qualify as control. However, decisions related to the job performance, such as advising workers—who do not know if the pipes on which they work contain toxic or non-toxic matter—whether they should wear protective breathing devices, do qualify as some control. At that point the property owner is advising the worker how the work should be done, not merely ordering the work stopped or started. Thus the statute's definition of control does not exclude this case.

### B. The Legislative History of Chapter 95 Does Not Exclude this Case.

Although the legislative history and the general movement of the law toward narrower liability on property owners is relevant, it does not bode badly for this case. In fact, this case does not offend that trend and does not involve the type of facts that led to the enactment of Chapter 95.

#### 1. The fact issues here are not like the safety issues in the cases the majority discusses.

Each of the cases the majority discusses—cases that apparently led to the enactment of Chapter 95—are substantively different from this case. Here, Dyall was an expert in welding, or at least knew how to weld. However, because he was not an employee of Simpson, he did not know the plant facilities and certainly did not know what substances each of the pipes at the

plant carried. If Dyall and Carter knew which substances at the plant were toxic and which were not, they would not have asked three or four times whether they needed air packs or whether a substance was safe to work around, as they did (1) when they arrived at the plant entrance, (2) when they received their work orders from Elleven, (3) when they asked what the foamy substance was that a worker washed down a drain, and (4) when a foul odor appeared and they noticed a second leak. In effect, Dyall had expert knowledge only about the welding part of the job; the other part of the job, knowing which chemicals at the plant could injure him, he did not know. That is different than the cases cited by the majority.

In *Lee Lewis*,[3] the employee of the subcontractor was fatally injured by a safety decision his employer made while the company installed windows in a high rise. *Lee Lewis Constr., Inc. v. Harrison*, 70 S.W.3d 778, 781–82 (Tex.2001). The safety decision directly related to work the sub-contractor did and in which it was an expert, high rise window installation. It did not involve, as this case does, a type of work or a work place with which the sub-contractor was unfamiliar. *See id.* at 784–85.

In *Koch Refining*, the premises owner had a safety employee observe the work of its sub-contractor. *Koch Ref. Co. v. Chapa*, 11 S.W.3d 153, 156 (Tex.1999). Koch Refining was held not liable because it merely observed its contractor work. *Id.* at 156–57. Unlike the facts here, the safe-

ty employee did not advise the subcontractor on any safety issues. *Id.*

In *Dow Chemical*, an employee of the independent contractor sued Dow for injuries allegedly caused by a fellow employee of the independent contractor. *Dow Chem. Co. v. Bright*, 89 S.W.3d 602, 605 (Tex.2002). As with *Koch Refining*, Dow had only the authority to stop the work, and it did not engage in discussions with the independent contractor as to how the job should be done. *Id.* at 607–09.

In each of these cases, the premises owner either (a) did not discuss with the independent contractor how a certain aspect of the job should be done, or (b) the independent contractor was working in an area within its realm of expertise.[4] This case is different. Dyall and Carter were not very familiar with this plant and showed by their actions that they did not know which fumes were toxic and which were not. Or, at least on this record, a fact issue exists on this point. Welding was their expertise—noxious fumes were not.

In short, *Lee Lewis, Koch Refining,* and *Dow Chemical* illustrate the fact scenario the Legislators intended Chapter 95 to reach: an expert sub-contractor suing a landowner for injuries occurring in the sub-contractor's area of expertise. Our appeal involves a landowner with more expertise than the subcontractor on the very part of the job for which the landowner is being sued.

---

**3.** The majority's description of *Lee Lewis Construction, Inc.* is inaccurate. The general contractor was not held liable simply because it had a regulation that companies use lifelines when working in high places; rather, the general contractor was more actively involved in directing the sub-contractor's work.

**4.** For example, a sub-contractor who regularly installs windows in high-rise buildings should know the best way to ensure an em-

ployee's safety while installing the windows. *See Lee Lewis Constr., Inc.*, 70 S.W.3d at 785. An independent contractor regularly performing maintenance on large commercial elevated signs knows the safety concerns connected with working in high places. *See Samco Props., Inc. v. Cheatham*, 977 S.W.2d 469, 476 (Tex.App.-Houston [14th Dist.] 1998, pet. denied).

Thus, holding that this case falls within the control exception to section 95.003 will not open the floodgates for lawsuits. This case does not present the fact scenario Chapter 95 was designed to address.

**2. The sponsoring legislator's example of a factual scenario not precluded by section 95.003 is similar to this case.**

Finding that this case provides some proof of "control" is not an inconceivable stretch as the majority argues, for the legislative history contains an example of control startlingly like this one. In the example, a maintenance contractor who has a contract to perform work at the plant arrives to weld on a pipeline. The property owner informs the contractor the lines are clear and ready for welding when they are not clear. As a result, the contractor's employee is injured by chemicals released from the line. This is how the legislative sponsor described it:

> Example: Likewise, if we have a maintenance contractor who gets a contract to perform work at the plant, and the property owner informs the contractor that the lines are clear and ready for welding, when in fact they are not, due to the property owner's negligence, and an employee of the maintenance contractor is injured by the release of chemicals. Nothing in this chapter would change the burden of proof or the damages recoverable.

H.J. OF TEX., 74th Leg., R.S. 2611–12 (1995).[5,6]

From the legislator's perspective, the most important fact in the example—that the land owner negligently informed the welder he could work safely on the line—is a factual thread running through this case. If nothing else, Dyall at least created a fact issue on whether the land owner, Simpson, led Dyall to believe he could safely work on the line without protective breathing equipment.

The example also contains facts that are different than the facts in this case; one of the facts is insignificant, one is significant. First, in the example, the workers were told the line was clear, meaning that it was empty. Here, the workers were not told the line was clear, but they were led to believe they did not need protective breathing equipment because the material in the line was not toxic. That is an insignificance difference. Second, in the example, the workers were not advised how to do their job. Here, the workers were advised they did not need protective breathing equipment. That difference is significant.

Thus, the plain language of the statute and the Legislative history support a conclusion that this is not the type of case the legislature intended Chapter 95 to preclude.

**5.** The majority argues that we must look only to the statute itself to glean the legislature's intent. However, "[e]ven when a statute is not ambiguous on its face, we can consider other factors to determine the Legislature's intent, including ... the legislative history; the common law or former statutory provisions, including laws on the same or similar subjects; [and] the consequences of a particular construction...." *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 493 (Tex.2001).

**6.** This example underscores a potential problem with the statute as currently written. Clearly, the sponsor of the bill believed Chapter 95 would not apply to this fact scenario. Yet, the plain language of the statute seems to cover this example because the worker 1) was injured, TEX CIV. PRAC. & REM.CODE § 95.002(1), 2) by a condition or use of an improvement to property, *Id.* at 95.002(2), 3) on which he was working, *Id.*, and the property owner 4) did not retain some control over the work, *Id.* at 95.003(1), and 5) was not aware of the dangerous condition, *Id.* at 95.003(2).

### III. When we View the Evidence in the Light Most Favorable to Dyall, a Fact Issue Emerges.

Thus far, then, we know four important things. First, the majority used the wrong standard of review; second, the majority wrongly considered knowledge; third, this case falls within the statute's definition of "control;" and fourth, the legislative history supports the concept that Dyall could recover if the facts are reviewed in his favor. We do not know one important piece of information—what the evidence reveals when we review it appropriately. When we view the evidence in the light most favorable to Dyall, a fact issue emerges, as the following points illustrate.

**A. Some Evidence Shows that Simpson Employees Considered Themselves the Experts and In Charge of Safety for All People Who Worked at the Plant, Including Subcontractors.**

First, Simpson employees considered themselves experts and in charge of safety for all people working at the plant. In his response, Dyall included deposition testimony of three Simpson employees, each of whom agreed that they were responsible for safety at the plant and would not allow contractors to work around chlorine dioxide—at least not without an air pack or an air-line respirator.

The first of these employees is Bruce Stiles, a shift supervisor for the bleach plant facility where the leak sprouted. He acknowledged that the pipe may have had some residue of chlorine dioxide in it, but because he could not detect an odor of chlorine dioxide, he thought Dyall and Carter could work on it without protective equipment.

#### Bruce Stiles's Deposition

Q. On April the 19th when you saw the leak in the ClO2 [chlorine dioxide] injector that we're talking about, what were you doing in the pine bleach plant at the time? Were you just performing a routine inspection of the facilities?

A. Right. That was my job. I walked around, just checking everything.

Q. And you see the leak from—I think you said a good distance away, you could see it was leaking?

A. Yes.

Q. Would you describe it as a spray or just like a flowing leak? Or how would you describe it?

A. It was a spray. Probably a pinhole but maybe the size of a pen point or something. It was spraying down on the concrete. It wasn't a flow. It does not take much ClO2 [chlorine dioxide] at the pure form to be able to see it.

\* \* \* \* \* \*

Q. Well, what was the leak? What material was leaking?

A. While we were running, the material that was leaking was ClO2 [chlorine dioxide].

\* \* \* \* \* \*

Q. Did you see a green cloud associated with it?

A. Yes, there was a green cloud in there also, yes.

Q. What did you do immediately after you saw that?

A. I called and told the bleach plant operator to shut the facility down.

\* \* \* \* \* \*

Q. Was it your decision to get IPP out there or—

A. It was a joint decision.

Q. Why did you want them out there?

A. Because we can't run the plant and put ClO2 [chlorine dioxide] in the air. We can't do that. Or couldn't do that.

\*    \*    \*    \*    \*    \*

Q. You were over there on several occasions, I mean—

A. Yes.

Q. —for long periods of time?

A. Yes. I mean, as far as I remember, I stayed there basically the whole time, other than maybe go to the phone or something. There wasn't a phone right there.

Q. . . . And at any time during that interval, the period of time that IPP was out there, did you witness the clear liquid leak? Did you see it still leaking?

A. Yes. When they were putting the goop around it, that's how—whoever it was told me that, you know, we hadn't stopped it. Because you could still see the liquid leaking from around the patch he was putting on it. Yes.

Q. What does "a clear liquid" mean to you?

\*    \*    \*    \*    \*    \*

A. I couldn't smell it and I couldn't see it so it meant it was safe, to me.

Q. Do you think it was water?

A. Yeah. It was mostly water. I couldn't say whether it had any kind of residue. But yes, I considered it to be water.

Q. *When you say "residue," do you mean pulp?*

A. *No. I mean maybe it could have ClO2 [chlorine dioxide] residue. I don't know.*

\*    \*    \*    \*    \*    \*

Q. *If there was a low-level exposure coming out of a leak to diluted chlo-rine dioxide water, would that be something that a shift supervisor would point out to an independent contractor that was coming.*

A. *Yes. But if it was where I could actually smell it, I would not put a person to work in it, no.*

Q. Why is that?

A. Kind of what chlorine dioxide does. I mean—

Q. It's bad stuff?

A. It's bad stuff. I don't know what it does to you in the long term, but I know what it does to you short term. It's my responsibility also for that area. If our maintenance people work in a chlorine leak or something, they would go in with full face equipment.

Q. Full face equipment. Now, would that be where you have your own oxygen with you?

A. Not an air pack no. It has a canister that filters it out.

Q. But that would filter all your air that you were getting when you were around it that way?

A. Yes.

Q. And you have those there at the facility?

A. Yes.

(emphasis added)

The second employee was James Bueker, superintendent of the pine bleaching plant where Dyall was working. Like Stiles, he agreed that he would interrupt a person working around chlorine dioxide and tell them that they needed an air respirator or mask. He also felt he had more of a duty to warn subcontractors who were working unsafely than employees because subcontractors might not be familiar with the plant and its toxins.

### James Bueker's Deposition

Q. I want to ask you about another comment that you made. *I believe you said that if you were walking through the plant and you saw someone working in or around a chlorine bleach or a ClO2 [chlorine dioxide] leak without air respirators or masks, you would have told them that they probably needed to be wearing an air respirator or mask?*

A. Uh-huh.

Q. Why would you tell them that?

A. I wouldn't care for them to get sick. I mean, ... if I walked by and there was a leak there and the person was working on it without a mask on and it was dripping a bunch of stuff, either he would need to put on a mask if he's going to work there, depending on which way the wind was blowing.

A lot of times if there was a small leak, you could put a water hose on top of the leak and that would keep it from, say, gassing off and you could very easily work on something. But if it was dripping quite largely or profusely, then our job would be to get everybody back and try and stop the leak. And if not, if it was a big leak, then you better put on a full-face or Scott air pack and you would have to go in there and flange it.

Q. *... [W]ould you consider that one of your duties, as being the bleach plant supervisor or superintendent, if you saw someone working unsafely, to point that out to them?*

A. Yes, absolutely.

Q. *At that time would you have considered that you had the right and the duty to say the same thing to subcontractors that were in there working, if you saw them working unsafely?*

A. *Probably more so to contractors, because they might not be familiar with the area.*

\* \* \* \* \* \*

Q. *What I'm trying to get at is: Because you had worked in the industry for many years, you knew immediately what the smell of chlorine dioxide was. But if someone had come to that facility and had never worked in a chlorine dioxide plant, would they be able to identify that specific odor?*

A. *... Not as being ClO2 [chlorine dioxide], but it's an odor that makes you want to leave. You don't need to know what it is.*

Q. *That's my point. In the sense that you may know it's a bad odor, but unless you've worked around it, you can't specifically identify what that specific odor was; is that correct?*

A. *Absolutely. I don't think you would know what it was.*

\* \* \* \* \* \*

Q. *So basically, if it's your first or second time into that facility, would you say there are a lot of new odors, if you've never been in a paper mill before, that a general person in the general population would not be familiar with?*

A. *Yes.*

\* \* \* \* \* \*

Q. *Is there a possibility that in working around a small leak of chlorine dioxide it could be diluted enough so that you could work maybe several feet away from it and it not be so strong that you must run imme-*

*diately, but you could continue to work if it's far enough away?*

A. *Yes.*

(emphasis added)

The third employee whose testimony was presented in Dyall's response to the summary judgment was Paul Licata, the environmental and safety manager for Simpson. As with Stiles and Bueker, he agreed that he would not allow a contractor to work at the plant without proper safety equipment.

### Paul Licata's Deposition

Q. . . . The chlorine dioxide water solution, is that commonly referred to as ClO2 water?

A. Yes.

Q. Is that a hazardous substance?

A. Yes.

\* \* \* \* \* \*

Q. No? Tell me why not.

A. The water solution itself is mostly water. And the hazard comes from the chlorine dioxide off-gassing from the water. So it would be an inhalation hazard more than a contact hazard.

\* \* \* \* \* \*

Q. If someone is going to be exposed to chlorine dioxide, should they have ventilation in the area?

A. If they're going to be exposed to it, they should remove themselves from the area.

Q. If there's no way—to help them from being exposed to it, should they have ventilation in the area to help remove the danger?

A. If there's no way to avoid the exposure, they should have respiratory protection.

\* \* \* \* \* \*

Q. Who was in charge of safety on April 19th, 1998 when you were not there?

A. The operations personnel are responsible for safety.

Q. And so for the bleach plant facility, who would that have been?

A. That would have been the production shift supervisor for the bleach plant.

\* \* \* \* \* \*

Q. *Would you, as environmental and safety manager for Simpson Pasadena Paper Company, have allowed a contractor to work without proper safety equipment if you knew of it?*

A. *No.*

\* \* \* \* \* \*

Q. *Mr. Pitts asked you if you were to see independent contractors who were working without the proper protection equipment, you wouldn't have allowed that to happen, is that correct?*

A. *Yes.*

Q. *If you knew of independent contractors who were working with leaking ClO2 water without face shields, without goggles and without respirators, would you have allowed them to continue working?*

A. No.

\* \* \* \* \* \*

Q. What was leaking?

A. Here again, this is difficult for me to understand. Because if we had that situation, the Simpson employee would understand that is in— that would be an emergency situation because that's going to off-gassing. And if it's not—For health reasons, it would be an environmental excursion (phonetic) that we

would want to know about. So they, No. 1, they shouldn't be allowing that to happen and, No. 2, should not be sending anybody into that situation.

\*　　\*　　\*　　\*　　\*　　\*

Q. At what parts per million is chlorine dioxide dangerous to human beings?

A. I'd have to look that up. It's in the one part per million or less range.

Q. So actually, if you're around chlorine dioxide, or you had to be, you would want a self-contained air pack; is that right?

A. If I was going in to repair a leak that involved chlorine dioxide, I would have to have an air pack, right, or an air-line respirator.

Q. And when you said that Simpson Pasadena Paper Company had the responsibility to discuss general hazards with contractors, that would include if they were going to be exposed to chlorine dioxide water, would it not?

A. That would be part of the pulp mill discussion, yes.

(emphasis added)

The majority does not consider any of this testimony or, if it does, it also looks at contradictory testimony. That is error.

## B. Simpson Employees Actually Advised Dyall and Carter Several Times Whether They Would Need Protective Breathing Gear.

The second important point we see from viewing the evidence in the light most favorable to Dyall is that in addition to considering themselves experts in safety, Simpson employees actually advised Dyall and Carter if they needed protective breathing gear. At the gate Dyall and Carter had a brief discussion with a Simpson employee about protective breathing equipment; he said he did not think they would need any gear but told them to talk with Jerry Elleven.

### 1. Dyall and Carter talked with Jerry Elleven about protective breathing gear.

The second Simpson employee to discuss protective safety breathing equipment with Dyall and Carter was Jerry Elleven. Dyall and Carter were directed to him immediately upon arriving at the plant. Elleven was responsible for telling Dyall and Carter what Simpson needed them to do and for showing them where they would be working. Elleven asked if they had full air packs. Upon learning that they had left them at their company's headquarters, he told them he did not think they would need them. Elleven sent them to "the safety guy" who issued Dyall and Carter throw-down packs they were to use in case of an emergency. Elleven watched them work at least part of the time. The record is not clear if Dyall and Carter later spoke with Elleven or someone else about the second leak that sprouted.

### 2. Dyall and Carter asked an employee washing a "foamy substance" down a drain if it was safe.

After receiving the throw-down packs, Dyall and Carter drove to the leaking flange. They noticed an employee washing a "foamy substance" down a drain. Not knowing what the substance was, they asked if they needed rubber boots or if the substance was safe for them to walk in without rubber boots. The employee assured them it was safe.

### 3. Simpson employees investigated a second leak that sprang while Dyall and Carter worked on the flange and led them to believe they need not worry about it.

Although the record is a little unclear at times, it appears that at least one new leak

sprang while Dyall and Carter were working on the leaking flange. Dyall and Carter asked Simpson employees if it was safe to work around the leak. Simpson employees assured them they could continue working because the substance flowing from the new leaks was the same as the material leaking from the flange.

In summary, all of this evidence shows the following. Simpson employees considered themselves experts on the toxins at the plant. Dyall and Carter were not experts on the toxins at the plant. Dyall and Carter did not know if they needed protective breathing gear and, if so, what kind. Dyall and Carter consulted with Simpson employees to ascertain if they needed protective breathing gear, and the Simpson employees advised Dyall and Carter no protective breathing gear was needed. This qualifies as some control and creates a fact issue.

It is error to hold otherwise.

### IV. DYALL'S OTHER COMMON LAW CLAIMS ALSO SURVIVE SUMMARY JUDGMENT BECAUSE DYALL RAISED A FACT ISSUE REGARDING CONTROL.

The final flaw in the majority's analysis relates to Dyall's other common law negligence claims. The majority correctly notes that these claims can be brought only if the plaintiff meets the two requirements of section 95.003 that the owner (1) control some aspect of the work and (2) know of the dangerous condition. However, because Dyall has created a fact issue on control, his common law negligence claims should not be dismissed. As the majority states, just as with Dyall's main claim of negligence, these claims also cannot be brought unless Dyall first shows that the owner exercised some control over the work. Because Dyall met that burden, Dyall should be able to continue his pursuit of these claims.

### CONCLUSION

For all of these reasons the court errs in holding that Dyall did not create a fact issue on the issue of control as raised in Simpson's motion for summary judgment and because Dyall created an issue on control, the majority errs in concluding that Dyall may not continue with his other claims for negligence. The court should reverse the judgment and remand the case to the trial court for further proceedings.