**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-12-00060-CV**
_____

**CALVIN CLARY, Appellant**

**V.**

**EXXONMOBIL CORPORATION AND
EXXONMOBIL OIL CORPORATION, Appellees**

**On Appeal from the 136th District Court
Jefferson County, Texas
Trial Cause No. D-183,398**

**OPINION**

Calvin Clary, an employee of The Newtron Group, Inc., worked with other Newtron employees at the ExxonMobil chemical plant in Beaumont repairing electrical equipment exposed to water during Hurricane Ike. As part of the contract, Newtron employees other than Clary removed damaged switchgear from the "switchgear 2" building, made necessary repairs, and put the switchgear back in the building. Clary, who worked outside on junction boxes, went to the building

1

to obtain signatures on a work permit. As he was leaving the building, a glass pane inset in a door fell out and injured his hand.

Clary sued ExxonMobil. He claimed that the company was negligent in the manner it maintained and inspected the worksite, and that the condition was unsafe. ExxonMobil filed a motion for summary judgment. The trial court concluded that there was "simply no evidence to establish the actual knowledge requirement on the part of defendant as required by §95.003[.]" *See* Tex. Civ. Prac. & Rem. Code Ann. § 95.003 (West 2011). The trial court granted ExxonMobil's motion.

Clary argues that Chapter 95 does not apply in this case. He also contends that if Chapter 95 does apply, summary judgment should have been denied because he "met the burden of section 95.003 to demonstrate that [ExxonMobil] exercised or retained some control over the manner in which the work was performed and had actual knowledge of the danger or condition."

THE IMPROVEMENT UNDER REPAIR

Section 95.003 applies to personal injuries that arise "from the condition or use of an improvement to real property where the contractor or subcontractor constructs, repairs, renovates, or modifies the improvement." Tex. Civ. Prac. & Rem. Code Ann. § 95.002 (West 2011). Section 95.003 provides:

2

A property owner is not liable for personal injury, death, or property damage to a contractor, subcontractor, or an employee of a contractor or subcontractor who constructs, repairs, renovates, or modifies an improvement to real property, including personal injury, death, or property damage arising from the failure to provide a safe workplace unless:

(1) the property owner exercises or retains some control over the manner in which the work is performed, other than the right to order the work to start or stop or to inspect progress or receive reports; and

(2) the property owner had actual knowledge of the danger or condition resulting in the personal injury, death, or property damage and failed to adequately warn.

*Id.* at § 95.003.

In this matter of statutory construction, we consider whether the electrical equipment alone or the entire building is to be considered the "improvement." If the electrical devices are the improvement under repair by the contractor, Chapter 95 may not apply, because the injury did not arise from the use or condition of the electrical devices. If the building is the improvement under repair by the contractor, then Chapter 95 may apply, because the injury arose from the condition or use of the building.

ExxonMobil contends that the statute applies even though "the particular object that injured the worker was not actually the improvement upon which the plaintiff was performing work." To the contrary, and relying on *Hernandez v. Brinker Int'l, Inc.*, 285 S.W.3d 152, 157-58 (Tex. App.—Houston [14th Dist.]

3

2009, no pet.) (plurality opinion), Clary argues Chapter 95 does not apply to his claim because his injury arose from the dangerous condition of an object (the door and glass window), which was separate from what he contends is the improvement (the electrical devices).

In *Hernandez*, the contractor had been repairing an air conditioner on the roof of a building. 285 S.W.3d at 153-54. While Hernandez was removing the compressor and taking it to another location on the roof, the roof collapsed and he fell through the opening. Hernandez sued the apparent owner of the building, and argued that Chapter 95 did not apply because the claim arose from the condition of a different improvement than that under repair: the roof, not the air conditioner. The defendant responded that the building was the improvement, and the air conditioner was a mere "'fixture' to the building." *See id.* at 156.

One Justice on the Fourteenth Court of Appeals concluded that Chapter 95 did not apply to the claims. He reasoned "pursuant to the plain language of section 95.002(2), Chapter 95 does not apply to a contractor's employee's claim against a property owner when the improvement the condition or use of which gives rise to the injury claim is not the same improvement the contractor was at the premise to address at the time of injury." *Id.* at 157-58. One Justice concurred in the appellate court's judgment, but for "reasons different from those stated in the plurality

opinion." *See id.* at 164 (Anderson, J., concurring). He concluded the defendant did not establish it was the property owner. *See id*. One Justice dissented. She concluded that Chapter 95 applied, reasoning that the improvement under repair was the building. *See id.* at 164-66 (Yates, J., dissenting).

Other courts of appeals have held that Chapter 95 applies even though a plaintiff is injured by something other than the object he is repairing. *See, e.g., Covarrubias v. Diamond Shamrock Ref. Co., LP*, 359 S.W.3d 298, 300, 302-03 (Tex. App.—San Antonio 2012, no pet.) (hydrocarbons released when scissor-lift that the contractor was using to access his work space hit a fitting that was not the object of his work); *Clark v. Ron Bassinger*, *Inc*., No. 07-03-0291-CV, 2006 Tex. App. LEXIS 795, at **5-6 (Tex. App.—Amarillo Jan. 31, 2006, no pet.) (mem. op.) (skylight was not the object of the employee's work, but it was an unsafe part of his workplace); *Fisher v. Lee & Chang P'ship*, 16 S.W.3d 198, 202 (Tex. App.—Houston [1st Dist.] 2000, pet. denied) (ladder provided a means for the contractor to reach his work site and the injury stemmed from a failure to provide a safe workplace); *see also Gorman v. Ngo H. Meng*, 335 S.W.3d 797, 805-06 (Tex. App.—Dallas 2011, no pet.) (referring to the plurality opinion in *Hernandez* as "a departure from the existing case law of other intermediate courts of appeals"). The statute has been applied to dangerous conditions "no matter when the condition

5

arose." *See Kelly v. LIN Television of Tex., L.P.*, 27 S.W.3d 564, 570 (Tex. App.—Eastland 2000, pet. denied). In *Kelly*, the Eastland appellate court stated that "Section 95.003 covers the workplace as well as the improvement being worked upon by the contractor[,]" and, citing *Fisher*, noted that "[t]his was recognized by the first reported case to construe the statute." *Id*. While Clary acknowledges these other decisions conflict with the lead opinion in *Hernandez*, he argues that this Court should follow the rationale of that opinion.

Under Clary's argument, the statute would protect an owner without actual knowledge of a defect only if the injury had resulted from the condition or use of electrical devices. Yet even before the statute was enacted, an owner would not likely have had liability for an injury to an electrician arising from the electrical device the electrician was hired to repair. *See Shell Chem. Co. v. Lamb*, 493 S.W.2d 742, 748 (Tex. 1973). Exceptions existed, where liability may possibly have been imposed. *See id.*; *see generally Dyall v. Simpson Pasadena Paper Co.*, 152 S.W.3d 688, 697-99 (Tex. App.—Houston [14th Dist.] 2004, pet. denied) (discussing the law before Chapter 95). But the electrical devices here were known to be in need of repair, and Newtron was on the property because of a technical specialty in electrical repair.

In *Lamb*, an electrical subcontractor was hired to assist in the construction of a facility. One of the subcontractor's employees received an electrical shock and fell from a ladder resulting in his death. His community survivors sued the general contractor under a duty-to-warn theory. The Supreme Court noted that "the duty owed by a general contractor to employees of its subcontractor is that duty owed by an occupier of land to a business invitee." *Lamb*, 493 S.W.2d at 746. The Supreme Court described the dangerous condition as "the existence of an exposed wire coupled with the termination of the other end of that wire into a switchboard which resulted in the occasional possibility (when the alarm system switch was turned on at the switchboard) of giving an electrical shock to a person with whom the wire came in contact." *Id.* at 747. Yet the Court held the contractor owed no duty to warn the electrical subcontractor of the dangerous condition. The Court reasoned in part:

> The dangerous condition in the instant case was peculiar to the technical specialty for which Fisk [the electrical subcontractor] was employed. Fisk had a duty to perform its work safely, and Fisk was in a superior position to prevent the existence of, to inspect for, and to eliminate or warn its employees of this dangerous condition.

*Id.* at 748. Because no duty to warn existed, a directed verdict was proper. *Id.*

*Lamb* was decided before Chapter 95 was enacted. We are not convinced that the Legislature intended Chapter 95 to be applicable only to injuries arising

7

from the specific object under repair. With the exception of the opinion in *Hernandez*, the statute has been applied broadly by the courts of appeals across the State. "Improvement" is a broad term, meaning essentially an addition to real property. *See* Black's Law Dictionary 826 (9th ed. 2009). Clary's injury arose from the condition or use of the "switchgear 2" building. The electrical equipment, the door, and the glass pane were parts of the same improvement. Members of Clary's crew and other Newtron employees were working in the building where the injury occurred. The electrical crews were there because of damage caused by Hurricane Ike. After the hurricane, the door that later failed became the primary access to the "switchgear 2" building. The "switchgear 2" building, not the switchgear alone, was the "improvement" within the meaning of Chapter 95. Because the injury arose from the condition or use of the improvement, Clary's claims are subject to Chapter 95.

## THE DEFECT

Clary contends that "ExxonMobil personnel had actual and constructive knowledge that the door . . . was not working properly and had been subjected to high pressure forces at the window level and above, both during and after the storm." Section 95.003(2) requires proof of actual knowledge, not constructive knowledge. *See* Tex. Civ. Prac. & Rem. Code Ann. § 95.003(2). Clary was

8

required to produce some evidence that ExxonMobil had actual knowledge of the danger or condition "resulting in the personal injury[.]" *See Gorman*, 335 S.W.3d at 802; *see also Rueda v. Paschal*, 178 S.W.3d 107, 111 (Tex. App.—Houston [1st Dist.] 2005, no pet.).

Clary testified that he only worked on ExxonMobil's premises for Newtron after Hurricane Ike, and that the first time he used the door in question was the day of the incident. He testified that after the accident, the ExxonMobil "top dog" told Clary "he was sorry that he hurt me" and reportedly directed that all of the windows in the plant be checked.

Mark Holt, a safety coordinator for Newtron, testified that he assisted in the investigation. He testified that, although he did not tell the person who wrote the investigation summary "how to write" it, the summary included findings that: the door was difficult to open prior to Hurricane Ike due to a binding on the threshold; a thirty-pound fire extinguisher is installed on the door; the door is equipped with a closing mechanism that prevents slamming of the door; after the hurricane the door became the primary access to the "switchgear 2" building; the frame mechanism fell into four parts as the glass fell from the door; the frame mechanism showed no signs of adhesive and appeared to lock into place to create a secure fit; the door is older than twenty years; and the integrity of the frame mechanism could have been

compromised. The recommendation of the investigation team was that competent professionals inspect all windows and doors with glass inserts to ensure their integrity. Holt testified that on another ExxonMobil incident form someone else noted that in places the window caulk was dry and missing, which caused or contributed to the injury. Holt stated that no problems or hazards concerning the door had ever been reported to him, and he had no knowledge of a problem with the door before or after Hurricane Ike.

Jody Peveto, an electrician for Newtron, testified that after Hurricane Ike it was a problem common to everyone who opened the door that the door was hard to open because of the frame dragging. Peveto said that Clary had helped him open the door because it was stuck. Peveto explained that he was unaware of anyone who had noticed the glass pane loose, and that to his knowledge the window had never been reported as a hazard. He testified that the inside of the building appeared to have been pressure-washed after the hurricane. Peveto never thought to report the sticking door because he did not consider the door a hazard.

Jim Fennell, a process safety engineer at ExxonMobil, participated in the investigation of the incident. At his deposition, Fennell reviewed pictures from the investigation and testified that he recalled that the door was in good condition, the door had a brownish water line on it, and one of the pictures showed the waterline

10

that the investigating team had observed and measured. According to Fennell, the investigation determined that the most likely cause of the incident was the hundreds of pounds of pressure from water pushing on the glass during Hurricane Ike. He agreed that it appeared the inside of the building had somehow been cleaned after the hurricane.

Clary maintains the door not only was subjected to strong forces during Hurricane Ike but the door also suffered from numerous long-standing defects: a "'binding' on the threshold that caused users to have to exert excessive force to open the door; a heavy fire extinguisher mounted on the door in a way that additionally threw off its balance; and a vestigial window, with glass secured by cracking caulk and a tension-based frame." Clary argues this evidence demonstrates ExxonMobil had actual knowledge of the danger or condition resulting in Clary's injuries.

Knowledge that the building had been subjected to hurricane conditions does not amount to actual knowledge that the glass pane inset in the door was a danger or a condition that could cause injuries. Peveto testified to the door sticking, but he never reported it to ExxonMobil because he never considered any part of the window or door a hazard prior to this incident. The other described "defects" of the door were observations made as a result of a post-incident investigation. Fennell

11

testified that the investigators concluded the door was difficult to open before the incident, but he did not have personal knowledge of that fact or the source of that information. No legally sufficient evidence supports Clary's contention that ExxonMobil had actual knowledge before the accident of the danger or condition resulting in the personal injury. Appellant's issues are overruled. The trial court's judgment is affirmed.

AFFIRMED.

_____
DAVID GAULTNEY
Justice

Submitted on April 8, 2013
Opinion Delivered September 5, 2013

Before McKeithen, C.J., Gaultney and Kreger, JJ.