**Motion for Rehearing Denied as Moot; Opinion of January 28, 2016, Withdrawn; Reversed and Rendered and Substitute Opinion filed August 4, 2016.**



**In The**

# Fourteenth Court of Appeals

---

### NO. 14-14-00158-CV

---

**OILTANKING HOUSTON, L.P., OILTANKING HOLDINGS AMERICAS, INC., OILTANKING PARTNERS, L.P., AND OILTANKING NORTH AMERICA, L.L.C., Appellants**

**V.**

**ALBERTO DELGADO, INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF JAVIER DELGADO, DECEASED, VICTORIA DELGADO, INDIVIDUALLY AND AS NEXT FRIEND OF MARIA DELGADO, A MINOR CHILD, JIMMY GUTIERREZ, JESUS DELGADO, SAMUEL DELGADO, EDGAR DELGADO, JOSE DELGADO, RAUL GRANADOS, MARIA GRANADOS, AND DOYLE "PIN" TODD, Appellees**

**On Appeal from the 127th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2012-32487**

---

### S U B S T I T U T E   O P I N I O N

We deny the motion for rehearing filed by appellees as moot. We withdraw

our opinion issued January 28, 2016, and we issue this substitute opinion in its place.

Oiltanking Houston, L.P., Oiltanking Holdings Americas, Inc., Oiltanking Partners, L.P., and Oiltanking North America, L.L.C. (collectively, "Oiltanking") appeal from a judgment in favor of the appellees following a jury trial. We reverse the trial court's judgment and render a take-nothing judgment in favor of Oiltanking.

## BACKGROUND

Javier Delgado, an employee of independent contractor L-Con, Inc., died in an explosion on June 2, 2012, when hydrocarbon fumes ignited while he was welding a flange on one end of a 24-inch pipe used to transport crude oil. The explosion occurred at Oiltanking's oil storage facility near the Houston Ship Channel. Javier Delgado was being assisted by L-Con employees Edgar Delgado, Raul Granados, and Doyle Todd, who were injured in the explosion.

Members of Javier Delgado's family filed a wrongful death claim against Oiltanking, which owned the premises and hired L-Con to work on the pipe. Edgar Delgado, Granados, and Todd also filed personal injury claims against Oiltanking. We refer to Javier Delgado, Edgar Delgado, Granados, and Todd collectively as "the claimants."

The 24-inch pipe was connected to an above-ground oil storage tank before welding began. Extensive trial testimony addressed (1) implementation of pre-welding procedures to block off the pipe, pump out the contents, disconnect it from the oil storage tank, install a plug to isolate the portion being welded, remove residual hydrocarbons inside the pipe, vent hydrocarbon vapors inside the pipe, and perform "sniff" tests for vapors; (2) which aspects of the process were controlled

by Oiltanking, and which were controlled by L-Con; and (3) the chain of events leading to the explosion.

Oiltanking designated L-Con as a responsible third party under Chapter 33 of the Civil Practice and Remedies Code; the trial court struck this designation at the close of evidence. Based on this ruling, the jury charge's liability questions contained a single yes-or-no answer blank by which the jury was asked to decide whether any negligence on Oiltanking's part proximately caused the occurrence.

By an 11-1 vote, the jury answered questions in favor of the claimants on three distinct liability theories; it also answered in favor of the claimants on a separate question submitted under Chapter 95 of the Civil Practice and Remedies Code to establish property owner Oiltanking's liability arising from injuries to an independent contractor's employees who were constructing, repairing, renovating, or modifying an improvement to real property.

The jury charge submitted four threshold liability questions followed by 14 questions relating to actual damages predicated on affirmative answers to at least one of the liability questions. The jury charge also submitted questions relating to punitive damages; the jury did not answer the punitive damages questions because its answers to the threshold liability questions were not unanimous.

Jury Questions Nos. 1, 3, and 4 each asked: "Did the negligence, if any, of Oiltanking proximately cause the occurrence in question?" These three questions defined "negligence" or "negligent" conduct differently under three distinct liability theories as set forth below.

- The jury answered "yes" in response to Jury Question No. 1, which submitted a negligent undertaking theory against Oiltanking "[w]ith respect to (1) cleaning, de-pressuring, flushing, draining, purging the

3

24" pipe and making the 24" pipe free of hazardous materials or (2) the performance of regular gas tests . . . ." *See Torrington Co. v. Stutzman*, 46 S.W.3d 829, 837 (Tex. 2000). The jury was instructed that "Oiltanking was negligent only if" it "undertook to perform services that it knew or should have known were necessary" for each claimant's protection; it failed to exercise ordinary care in performing those services; and the claimants either relied upon Oiltanking's performance, or that performance increased the risk of harm to them. *See id.* at 838.

- The jury answered "yes" in response to Jury Question No. 3, which submitted a liability theory against Oiltanking "[w]ith respect to the condition of the premises . . . ." The jury was instructed that "Oiltanking was negligent only if" the "condition posed an unreasonable risk of harm;" Oiltanking "had actual knowledge of the danger;" and Oiltanking "failed to exercise ordinary care to protect [the claimants] from the danger, by both failing to adequately warn [the claimants] of the condition and failing to make the condition reasonably safe." *See generally Clayton W. Williams, Jr., Inc. v. Olivo*, 952 S.W.2d 523, 528-29 (Tex. 1997); *see also Occidental Chem. Corp. v. Jenkins*, No. 13-0961, 2016 WL 82662, at *2 (Tex. Jan. 8, 2016) ("Although premises liability is itself a branch of negligence law, it is a 'special form' with different elements that define a property owner or occupant's duty with respect to those who enter the property.") (quoting *W. Invs., Inc. v. Urena*, 162 S.W.3d 547, 550 (Tex. 2005)).

- Jury Question No. 3 was predicated on a "yes" answer to Jury

4

Question No. 2, which the jury provided. Jury Question No. 2 asked: "Did Oiltanking exercise or retain some control over the manner in which L-Con performed its work, other than the right to order the work to start or stop or to inspect progress or receive reports?"

- Taken together, the "yes" answers to Jury Questions Nos. 2 and 3 satisfy the control and actual knowledge requirements for a property owner's liability on claims arising from death or injury to an independent contractor's employees who construct, repair, renovate, or modify an improvement to real property. *See* Tex. Civ. Prac. & Rem. Code Ann. § 95.003(1), (2) (Vernon 2011).

- The jury answered "yes" to Jury Question No. 4, which submitted a negligent activity theory against Oiltanking under which "negligence" was defined as the "failure to use ordinary care, that is, failing to do that which a person of ordinary prudence would have done under the same or similar circumstances or doing that which a person of ordinary prudence would not have done under the same or similar circumstances." The charge defined "ordinary care" as "that degree of care, which would be used by a person of ordinary prudence under the same or similar circumstances." *See generally Colvin v. Red Steel Co.*, 682 S.W.2d 243, 245 (Tex. 1984).

The jury assessed actual damages totaling $21,057,710.63. The trial court signed a final judgment against Oiltanking in conformity with the jury's affirmative answers and damage awards, which Oiltanking now challenges on appeal.

## ANALYSIS

Oiltanking assails the trial court's judgment based on the following grounds.

5

1. The claimants' causes of action based on negligent activity and negligent undertaking lack support in the evidence and are foreclosed under Texas law.

2. The evidence does not support the jury's "yes" answers as to the Chapter 95 elements of control and actual knowledge necessary to establish property owner Oiltanking's liability arising from death or injuries to an independent contractor's employees who were constructing, repairing, renovating, or modifying an improvement to real property. Additionally, no liability attaches because the hazard at issue was not concealed.

3. The trial court erred by striking Oiltanking's designation of L-Con as a responsible third party and failing to submit questions addressing L-Con's liability in the jury charge. *See* Tex. Civ. Prac. & Rem. Code Ann. § 33.003 (Vernon 2015).

4. The trial court erred in imposing spoliation sanctions.

5. The record cannot support bystander damages for Javier Delgado's brothers Samuel and Jose; damages for Doyle Todd's, Raul Granados's, and Edgar Delgado's future lost earnings; and mental anguish damages for Javier Delgado's father Jesus.

We begin by addressing Oiltanking's first two issues together.

## I. Liability Findings

The jury charge provided three routes to establish Oiltanking's liability in connection with the explosion that killed and injured employees of independent contractor L-Con while they were modifying an improvement to real property on Oiltanking's premises. The three routes are negligent undertaking pursuant to Jury

6

Question No. 1; premises liability under Jury Question No. 3; and negligent activity under Jury Question No. 4.

The parties devote considerable briefing to a dispute about whether Oiltanking's basis for liability should be characterized as negligent undertaking, premises liability, or negligent activity. In connection with this dispute, Oiltanking contends (among other arguments) that this record contains no evidence to support the jury's "yes" answers to Jury Question No. 1's negligent undertaking submission and Jury Question No. 4's negligent activity submission. Oiltanking contends that "the trial court erred in submitting liability questions pertaining to negligent activity and negligent undertaking in the jury charge, because these theories of liability are inapplicable in a premises liability context . . . ." Oiltanking further contends that "Chapter 95 is the exclusive remedy for all negligence claims against a property owner like Oiltanking."

As discussed more fully below, case law developments after the parties submitted their briefs streamline the analysis here by establishing that – regardless of the negligence theory being invoked by the claimants – Chapter 95's requirements must be satisfied before liability can attach to property owner Oiltanking under the circumstances presented in this case. *See Abutahoun v. Dow Chem. Co.*, 463 S.W.3d 42, 43-44 (Tex. 2015).

These developments make it unnecessary to decide precisely how these claims should be characterized in this case. We also need not decide whether sufficient evidence supports the "yes" answers to Jury Question No. 1 submitting negligent undertaking or Jury Question No. 4 submitting negligent activity. Regardless of the particular negligence theory submitted to the jury in this case, Chapter 95's control and actual knowledge requisites must be satisfied under *Abutahoun*. *See id.*

As to the jury's premises liability finding in response to Jury Question No. 3, Oiltanking contends there is no evidence to support (1) the predicate "yes" answer to Jury Question No. 2, upon which Jury Question No. 3 was conditioned, asking whether Oiltanking exercised or retained some control over the manner in which L-Con performed its work; and (2) the "actual knowledge" component of Jury Question No. 3. Oiltanking also contends liability does not attach because the hazard was not concealed. Oiltanking does not otherwise challenge the liability elements submitted in Jury Question No. 3.

If Oiltanking is correct and there is no evidence of either control or actual knowledge as required under *Abutahoun*, then liability is foreclosed. If there is some evidence of control and actual knowledge, and if Oiltanking's no-concealed-hazard argument is not viable, then the otherwise unchallenged answer to Jury Question No. 3 establishes a basis for Oiltanking's liability.

We will discuss *Abutahoun* further in the course of addressing Chapter 95's requirements.

## II.   Scope of Chapter 95

Chapter 95 was enacted in 1996 as part of a sweeping tort-reform package. *Ellwood Tex. Forge Corp. v. Jones*, 214 S.W.3d 693, 699 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) (citing *Dyall v. Simpson Pasadena Paper Co.*, 152 S.W.3d 688, 699 (Tex. App.—Houston [14th Dist.] 2004, pet. denied) (en banc)). "It was enacted because the legislature recognized that property owners often want to hire someone with expertise to repair or renovate some improvement on their property." *Dyall*, 152 S.W.3d at 699.

Chapter 95 applies to a claim

(1) against a property owner, contractor, or subcontractor for personal injury, death, or property damage to an owner, a contractor, or a

8

subcontractor or an employee of a contractor or subcontractor; and

(2) that arises from the condition or use of an improvement to real property where the contractor or subcontractor constructs, repairs, renovates or modifies the improvement.

Tex. Civ. Prac. & Rem. Code Ann. § 95.002 (Vernon 2011). "Claim" means "a claim for damages caused by negligence." *Id.* § 95.001(1) (Vernon 2011). "Property owner" means "a person or entity that owns real property primarily used for commercial or business purposes." *Id*. § 95.001(3).

Chapter 95 contains the following limitation on liability:

A property owner is not liable for personal injury, death, or property damage to a contractor, subcontractor, or an employee of a contractor or subcontractor who constructs, repairs, renovates, or modifies an improvement to real property, including personal injury, death, or property damage arising from the failure to provide a safe workplace unless:

(1) the property owner exercises or retains some control over the manner in which the work is performed, other than the right to order the work to start or stop or to inspect progress or receive reports; and

(2) the property owner had actual knowledge of the danger or condition resulting in the personal injury, death, or property damage and failed to adequately warn.

*Id*. § 95.003(1), (2).

Section 95.003(1) codifies the holding in *Redinger v. Living, Inc.*, 689 S.W.2d 415 (Tex. 1985), which in turn adopted section 414 and the accompanying comments of the Restatement (Second) of Torts. *See Ellwood*, 214 S.W.3d at 700; *Dyall*, 152 S.W.3d at 699. *Redinger* held that, while a premises owner owes no general duty to ensure that an independent contractor performs its work in a safe manner, the owner nonetheless may be liable if it retains some control over the manner in which the contractor's work is performed. *Redinger,* 689 S.W.2d at 418.

9

Section 95.003(2) limits a premises owner's liability by requiring a plaintiff to prove the owner had actual knowledge of a dangerous condition on the premises – not merely constructive knowledge. *See Ellwood*, 214 S.W.3d at 700; *Dyall*, 152 S.W.3d at 699. As this court has recognized, the use of an actual knowledge standard means that "Chapter 95 [i]ncreased the [r]equirements for [l]iability to be [i]mposed." *Ellwood*, 214 S.W.3d at 699.

Subsection 95.003(1)'s control requirement and subsection 95.003(2)'s actual knowledge requirement "both . . . 'must be met before liability will be imposed upon the property owner.'" *Dyall*, 152 S.W.3d at 699 n.15 (quoting *Kelly v. LIN Television of Tex., L.P.*, 27 S.W.3d 564, 567 (Tex. App.—Eastland 2000, pet. denied)).

The supreme court recently revisited Chapter 95 to decide whether it "applies to an independent contractor's negligence claims against a property owner when the claims are based on injuries arising out of the property owner's negligent activities and not the independent contractor's own work." *Abutahoun*, 463 S.W.3d at 43. The supreme court held that "Chapter 95 applies to all independent contractor claims for damages caused by a property owner's negligence when the requirements of section 95.002(2) are satisfied." *Id*. at 43-44.

*Abutahoun* rejected a contention that "Chapter 95 applies only to claims against property owners arising 'out of the contractor's work, and does not apply to a contractor who is a passive victim of the contemporaneous negligent activities of the premises owner.'" *Id*. at 47. The supreme court determined that Chapter 95 unambiguously "applies to a claim against a property owner for an independent contractor's personal injury, death, or property damage caused by negligence." *Id*. at 48. "The Legislature did not distinguish between negligence claims based on contemporaneous activity or otherwise, and neither shall we." *Id*. "Furthermore, .

10

. . section 95.002 says nothing about the actor who causes the negligence claim to arise and makes no distinction between harm caused by a contractor's actions and harm caused by another's actions." *Id*.

"We can only conclude that the Legislature intended for Chapter 95 to apply to all negligence claims that arise from either a premises defect or the negligent activity of a property owner or its employees by virtue of the 'condition or use' language in section 95.002(2)." *Id*. at 50. "For the sake of thoroughness, we note that section 95.002(2)'s inclusion of 'condition or use' preserves the notion that claims based on a premises defect are distinct from claims based on negligent activities." *Id*. "Despite their differences, both claims are a species of negligence." *Id*. (citation omitted). "[B]oth types of claims fall within the common meaning of the term 'negligence' that appears, undefined, in section 95.001(1) . . . ." *Id.* at 51.

The supreme court stated: "Chapter 95 applies to independent contractors' claims against property owners for damages caused by negligence when those claims arise from the condition or use of an improvement to real property where the independent contractor constructs, repairs, renovates, or modifies the improvement." *Id*. at 53. "Chapter 95 limits property owner liability on claims for personal injury, death, or property damage caused by negligence, including claims concerning a property owner's own contemporaneous negligent activity." *Id.* This language in *Abutahoun* sweeps broadly enough to encompass all flavors of negligence submitted in the jury charge against Oiltanking, including negligent activity and negligent undertaking.[1]

---

[1] To the extent of any conflict between *Abutahoun* and *Elmgren v. Ineos USA, LLC*, 431 S.W.3d 657 (Tex. App.—Houston [14th Dist.] 2014), *aff'd in part and rev'd in part*, ___ S.W.3d ___, No. 14-0507, 2016 WL 3382144 (Tex. June 17, 2016), we apply *Abutahoun*'s analysis and holding regarding Chapter 95's applicability to negligence claims other than those characterized

11

The supreme court further stated: "[W]hen section 95.002 makes Chapter 95 applicable to an independent contractor's negligence claim against a property owner that arises from the condition or use of an improvement to real property, the independent contractor's sole means of recovery is by satisfying section 95.003." *Id.* at 51; *see also Occidental Chem. Corp.*, 2016 WL 82662, at *5 ("[P]remises-liability principles apply to a property owner who creates a dangerous condition on its property, and . . . the claim of a person injured by the condition remains a premises-liability claim as to the owner-creator, regardless of how the injured party chooses to plead it."). Thus, when Chapter 95 applies, the employees of an independent contractor must establish that section 95.003's control and actual knowledge conditions have been met before liability can be imposed on the property owner. *Abutahoun*, 463 S.W.3d at 52.

Before turning to the parties' contentions regarding evidence of control and actual knowledge on this record, we pause to address a waiver argument.

The claimants contend Oiltanking waived all arguments regarding Chapter 95 because Oiltanking failed to request and obtain jury findings on issues establishing applicability under section 95.002. The claimants further contend that findings favorable to them on disputed facts under section 95.002 may be implied in support of the trial court's judgment under Texas Rule of Civil Procedure 279.

as premises liability claims. *See Chase Home Fin., L.L.C. v. Cal W. Reconveyance Corp.*, 309 S.W.3d 619, 630 (Tex. App.—Houston [14th Dist.] 2010, no pet.) (This court must follow prior holding of another panel of this court "[a]bsent a decision from a higher court or this court sitting en banc that is on point and contrary to the prior panel decision or an intervening and material change in the statutory law[.]"); *see also Ineos USA, LLC v. Elmgren*, ___ S.W.3d ___, No. 14-0507, 2016 WL 3382144, at *3 (Tex. June 17, 2016) ("[T]he court erred in holding that Chapter 95 applies only to the Elmgrens' premises-liability claims. The trial court correctly applied Chapter 95 to all of the Elmgrens' negligence-based claims, at least against Ineos."). *Abutahoun* did not disturb those portions of *Elmgren*'s analysis pertaining to issues other than Chapter 95's applicability to claims denominated as negligent activity and negligent undertaking. *See Ineos USA, LLC*, 2016 WL 3382144, at *3-9.

The claimants do not point to any evidence indicating that a fact dispute existed about whether their claims were "against a property owner . . . for personal injury [or] . . . death to . . . an employee of a contractor or subcontractor" as required under section 95.002(1). Nor do they point to any evidence indicating that fact disputes existed about whether their claims arose "from the condition or use of an improvement to real property where the contractor or subcontractor constructs, repairs, renovates, or modifies the improvement" under section 95.002.

According to Oiltanking, the claimants "never disputed that Oiltanking was a 'property owner,' or that Javier Delgado was an 'employee of a contractor' whose claim 'arises from the condition or use of an improvement to real property where the contractor constructs, repairs, renovates, or modifies the improvement'" under section 95.002. Oiltanking contends the claimants argued in the trial court that "Chapter 95 does not apply to their negligent undertaking or negligent activity claims." This argument no longer is viable after *Abutahoun*.

We reject the claimants' waiver argument because they have identified no material disputed facts concerning Oiltanking's status as a property owner; L-Con's status as an independent contractor employing the claimants; the nature of the claimants' welding work on Oiltanking's premises with respect to renovating or modifying an improvement to real property; or whether the wrongful death and injury claims at issue arose from the condition or use of an improvement to real property where the claimants were renovating or modifying the improvement. The claimants assert in their appellate brief that "a key question is whether the injuries were occasioned by the *same* improvement that L-Con was constructing, repairing, renovating, or modifying." They provide no argument or record discussion indicating that (1) this "key question" was actually in dispute in the trial court; or (2) the claimants' injuries were attributable to an improvement other than the 24-

13

inch pipe L-Con had been hired to modify.[2] These circumstances confirm that a waiver contention is unwarranted. *See, e.g., XCO Prod. Co. v. Jamison*, 194 S.W.3d 622, 632-33 (Tex. App.—Houston [14th Dist.] 2006, pet. denied) (no jury submission is required with respect to facts that are undisputed or conclusively established) (citing *Sullivan v. Barnett*, 471 S.W.2d 39, 44 (Tex. 1971), and *Meek v. Bishop, Peterson & Sharp, P.C.*, 919 S.W.2d 805, 808 (Tex. App.—Houston [14th Dist.] 1996, writ denied)).

Having mapped the narrower legal terrain on which this battle now must be fought, we turn to section 95.003(2)'s actual knowledge requirement because it is dispositive.[3]

---

[2] As discussed more fully below, the claimants attributed the explosion to an accumulation of flammable vapors arising from hydrocarbon residue inside the same 24-inch pipe that was being welded. Resolution of this case does not require us to address different circumstances involving injuries attributable to a condition or use of an improvement other than the improvement being repaired or modified by the independent contractor. *Cf. Hernandez v. Brinker Int'l, Inc.*, 285 S.W.3d 152, 157-58 (Tex. App.—Houston [14th Dist.] 2009, no pet.).

[3] The claimants argue on rehearing that a remand is warranted in light of *Abutahoun*. We disagree because all parties knew Chapter 95's actual knowledge requirement was a contested issue in this case. This contested issue was hard-fought pretrial through summary judgment and at trial, and was submitted in the jury charge. *Abutahoun* addressed the legal reach of Chapter 95's requirements with respect to negligence claims denominated as something other than premises liability, but it did not change the evidentiary showing necessary to demonstrate actual knowledge under Chapter 95. On rehearing, the claimants state that "Oiltanking did not have actual knowledge" of the "presence of flammable vapors *outside* the plumber's plug, mixed with air and near the flame." Although they suggest on rehearing that the record should be "developed more fully with respect to Oiltanking's actual knowledge of its inept remedial efforts" based upon the pervasive presence of hydrocarbons at this facility, the claimants also have acknowledged that (1) the specific injury-causing hazard at issue in this case "arose during the work" being performed by L-Con; and (2) "[t]he hazardous condition of which Oiltanking had actual knowledge was not the specific fumes on the wrong side of [the] plumber['s] plug." As discussed more fully below, the supreme court's analysis of Chapter 95's actual knowledge requirement confirms that actual knowledge in these circumstances requires more than knowledge of a need for elaborate safety precautions due to "the mere presence of flammable or explosive gasses at a petrochemical plant." *See Ineos USA, LLC*, 2016 WL 3382144, at *8-9.

14

## III.  Actual Knowledge Under Chapter 95

The claimants had to prove "Oiltanking had actual knowledge of the danger" as an element of liability under Question No. 3.  This element comports with Chapter 95.  *See* Tex. Civ. Prac. & Rem. Code Ann. § 95.003(2).

"[K]nowledge that an activity is potentially dangerous is not sufficient to satisfy the second prong of Section 95.003—actual knowledge of the danger is required."  *Dyall*, 152 S.W.3d at 709 n.18.  "Actual knowledge requires knowledge that the dangerous condition existed at the time of the accident, as opposed to constructive knowledge which can be established by facts or inferences that a dangerous condition could develop over time."  *City of Corsicana v. Stewart*, 249 S.W.3d 412, 414-15 (Tex. 2008).  "Actual knowledge of a dangerous condition is what a person actually knows, as distinguished from constructive knowledge, or what a person should have known."  *Elmgren v. Ineos USA, LLC*, 431 S.W.3d 657, 665 (Tex. App.—Houston [14th Dist.] 2014), *aff'd in part and rev'd in part*, __ S.W.3d __, No. 14-0507, 2016 WL 3382144 (Tex. June 17, 2016); *see also Kelly*, 27 S.W.3d at 572-73 (evidence of negligent failure to inspect for stress fractures and metal fatigue is not equivalent to actual knowledge of danger of tower collapse due to stress fractures).

Oiltanking contends that legally insufficient evidence supports an affirmative finding on actual knowledge.  The test for legal sufficiency is whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review.  *City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex. 2005).  When reviewing the legal sufficiency of the evidence, we consider the evidence in the light most favorable to the verdict and indulge every reasonable inference to support it.  *Id.* at 822.  We credit favorable evidence if a reasonable juror could and disregard contrary evidence if a reasonable juror could not.  *Id.* at 827.

Assessing the legal sufficiency of evidence supporting a finding that "Oiltanking had actual knowledge of the danger" requires a discussion of the trial record addressing how the explosion occurred. We now turn to this task, presenting such testimony in light of the applicable standard of review.

## A.    Trial Testimony

Oiltanking and L-Con operated under a Master Service Agreement that designated L-Con as an independent contractor. Pursuant to the Master Service Agreement, Oiltanking hired L-Con to reroute a 24-inch pipe connected to an oil storage tank. Both the storage tank and the section of pipe being rerouted were located above ground.

L-Con worked on the pipe on June 1 and June 2, 2012. L-Con employees began working during the afternoon on June 1 and welded for about 45 minutes before stopping for the day about 4:30 p.m. They resumed work shortly after 6:40 a.m. on June 2 and continued until the explosion occurred at approximately 8:10 a.m.

Before L-Con's employees began work on June 1, Oiltanking personnel closed valves to cut off the flow of hydrocarbons to the pipe and pumped out the pipe. Oiltanking personnel then installed "slip blinds" to isolate the storage tank from the portion of pipe being modified. After Oiltanking installed the slip blinds, L-Con employees moved into the area around the tank and set up equipment to perform a "cold cut" on the pipe. A "cold cut" involves cutting the pipe without producing sparks that could cause ignition of hydrocarbons.

The cold cut created a gap of several feet separating the pipe from the oil storage tank. Once the cold cut was completed, an L-Con employee installed a metal "plumber's plug" inside the separated portion of the pipe approximately two

16

or three feet from the opening. The circular plumber's plug matched the circumference of the 24-inch pipe. The plug featured a rubber seal around its circumference that could be expanded to create a barrier between (1) the open end of the pipe created by the cold cut, which is where L-Con was to weld a new flange; and (2) the remaining portion of the separated pipe located behind the plug.

The face of the disk-shaped plumber's plug included a vent pipe to allow attachment of a vent hose extending out of the 24-inch pipe's open end. The combination of vent pipe and hose was intended to (1) prevent pressure from building up behind the plug; and (2) vent gases from any residual hydrocarbons present behind the plug for safe release into an area about 30 feet away from the open end of the 24-inch pipe being welded. Oiltanking owned the plumber's plug and vent pipe installed by L-Con.[4]

Following L-Con's installation of the plumber's plug, Oiltanking shift supervisor Damon Huggins removed residual hydrocarbons by wiping down the inside of the 24-inch pipe from the front edge of the plumber's plug forward to the open end where welding would occur. Huggins testified that he did not check to determine whether residual hydrocarbons were present inside the pipe behind the plumber's plug and did not wipe down the inside of the pipe behind the plumber's plug to remove any residual hydrocarbons that might be present there.

Oiltanking required a "Work Permit" form to be signed before L-Con could proceed with welding. Among other things, the form contains a check-box list of specific statements in a section labeled "Hot Work Permit." These statements

---

[4] After the June 2 explosion, Oiltanking obtained a different type of plumber's plug called a "CARBER" tool so that the welding job L-Con began on June 1 could be completed. The "CARBER" tool has the same hose fitting as the plumber's plug used on June 2. The "CARBER" tool differs from the plumber's plug used on June 2 because the "CARBER" tool (1) has a gauge allowing pressure behind the plug to be monitored; and (2) allows water to circulate to keep the pipe perimeter cool.

included the following.

- "A Gas-free Certificate is required for the work[;]"

- "The equipment has been de-pressurised/flushed/drained/purged and is free of hazardous material[;]" and

- "The immediate work site has been cleared from combustible materials[.]"

Huggins signed the permit form as the "Authorized Permit Issuer" allowing L-Con to proceed with welding. His signature appears under this statement: "I confirm that all necessary measures have been taken to ensure the work is carried out safely." All boxes on the "Hot Work Permit" portion of the form were checked. Huggins also signed the separate "Gas-free Certificate" portion of the form, which contains this statement: "The confined space/equipment/vessel/work site . . . has been gas tested by an Approved Gas Tester and certified gas-free." The date "6/2/12" and the time "0630" are written next to both locations on the form bearing Huggins's signature.

The "Gas-free Certificate" portion of the form contains handwritten notations of zero for "Gas (% L[ower]E[xplosive]L[imit])," zero for hydrogen sulfide "(ppm)," and an oxygen percentage of "20.8." The initials "DH" and "KM" appear next to these figures. The "DH" initials stood for "Damon Huggins." The "KM" initials stood for "Kevin McCrory," who was the Oiltanking shift supervisor on June 1. Huggins testified that McCrory "filled out this permit, getting it ready for me" and did so "[p]robably before he went home [on] Friday" June 1. Huggins testified that McCrory did not perform a gas test on June 2, and that McCrory's initials should not have been on the June 2 "Gas-free Certificate" portion of the work permit. Huggins testified that ". . . Kevin McCrory was not there Saturday. He filled the permit out Friday and the only – I did the signing off

18

on it." McCrory testified that placing his initials on the June 2 form "was a mistake."

Huggins testified that he performed a "gas test" himself to check the concentration of flammable hydrocarbon vapors once on June 1 and again "somewhere around 6:40" on the morning of June 2. A record from Huggins's gas meter indicated that it had been used at 9:15 a.m. on June 2. Huggins testified that the gas meter had been calibrated on June 1, but "the time was off on the meter" by "2 hours and 33 minutes" and he did not reset the time and date readings on the meter. Huggins also testified that he did not document on the June 2 permit (1) the exact time he performed the gas test on June 2; or (2) a notation indicating that the gas meter's time record was inaccurate.

Oiltanking's engineering expert Roger Craddock testified that no explosion would have occurred on June 2 if no hydrocarbons were present in the 24-inch pipe behind the plumber's plug while Javier Delgado was using a torch to weld a flange on the pipe's open end. Craddock also testified that Oiltanking could have purged the 24-inch pipe with nitrogen; cleaned the inside of the pipe with soap and water to remove hydrocarbon residue; or disconnected the pipe and taken it to another location to weld.

Craddock noted that the vent hose was not connected to the vent pipe following the explosion. He opined that the explosion occurred because an unidentified person unhooked the vent hose attached to the plumber's plug while L-Con's work was underway, which allowed hydrocarbon vapors inside the pipe to migrate from behind the plumber's plug and enter the area in front of the plug; come into contact with the arc of Javier Delgado's welding torch; and ignite. Delgado was decapitated when the explosion shattered the plumber's plug and expelled the pieces from the 24-inch pipe's opening where he was working.

The claimants' expert process safety engineer, Michael Sawyer, testified that Oiltanking (1) improperly cleaned explosive material from the 24-inch pipe and failed to remove residual hydrocarbons from the portion of the pipe behind the plumber's plug; (2) failed to adequately survey the work area for explosive vapors; and (3) used a "very sloppy" permit procedure under which the "Gas-free Certificate" portion of the form was filled out on June 1 instead of June 2. According to Sawyer, "This was a sloppy, fraudulent permit that provided incorrect information to the contractors saying that everything was okay to do hot work." Sawyer also stated: "It's just that it was sloppy and had incorrect information communicated to the contractors and the permit is used as the final authorization to begin work." Sawyer agreed with Craddock's testimony that no explosion would have occurred if no hydrocarbons had been present in the 24-inch pipe while Javier Delgado was using a welding torch on the pipe's open end.

Sawyer characterized Craddock's conclusion regarding removal of the vent hose during welding as "a rabbit trail" that "has nothing to do with the root cause." According to Sawyer, the vent hose more likely than not became disconnected from the vent pipe due to the explosion's force.

Sawyer stated: "No one in the process plant that's a prudent owner/operator relies on one barrier or one safeguard. There's multiple safeguards and barriers for all processes because of the materials that are involved, the hydrocarbons." According to Sawyer, a rubber seal on the plumber's plug could not be relied upon to create a complete barrier that would exclude hydrocarbon vapors from the open end at which Javier Delgado was welding. In Sawyer's opinion, hydrocarbon vapors attributable to residue in the pipe accumulated behind the plumber's plug. He opined that these vapors likely leaked through the plumber's plug via the rubber seal and other gaps in the plug during welding; entered the area where

20

Javier Delgado was welding at the pipe's open end; and ignited when they came into contact with the arc from his welding torch. Sawyer also stated: "Oiltanking knew what material had flowed through that line for X number of years. They knew the physical properties of the material, how hazardous it was and they also – Oiltanking knew that if you're going to have a heat source like welding carried on in that area, it needs to be clear of all hydrocarbons."

## B.     Application of the Actual Knowledge Standard

Oiltanking contends as follows based on this record: "[T]here is no evidence in the record supporting a finding that Oiltanking had actual knowledge of a hydrocarbon gas leak during the welding." Oiltanking also contends: "At most, Plaintiffs claim that Oiltanking negligently failed to ensure that the pipe was safe despite knowing that the pipe was potentially dangerous . . . ."

The claimants argue on appeal that (1) "the hazard arose during the work" being performed by L-Con; and (2) "Oiltanking had actual and superior knowledge of the hydrocarbons left in the adjacent tank and in the pipe, and should not have certified in writing to L-Con the pipe was clear of hydrocarbons." They contend Oiltanking "knew of the existence of the hydrocarbons within and around the improvement upon which the welders were working" because crude oil had been pumped from the tank through the 24-inch pipe within a day of L-Con's arrival to begin work. They assert in briefing that "Oiltanking issued a hot work permit without actually testing whether the worksite was safe; failed to clean the residual hydrocarbons from the pipe; [and] failed to properly clean and sniff the welding site . . . ." During closing argument, the claimants' counsel urged the jury to answer "yes" to Jury Question No. 3 as follows:

> So we know that Oiltanking had actual knowledge of the danger. What was their actual knowledge? We just moved 72,000 barrels of

21

product through this pipe. That's actual knowledge. They did it. They documented it and here it is and this is an exhibit that's going back with you so you'll have an opportunity to look at Oiltanking's actual knowledge of the danger, which is the crude oil.

This closing argument tracks claimants' written appellate arguments, in which they contend: "Oiltanking had actual knowledge that its tanks were indeed filled with oil, and that elaborate safety precautions are necessary to protect workers from the risk of explosive vapors--hence the detailed Hot Work Permit." And, again in their post-submission brief, claimants urge as follows:

The hazardous condition of which Oiltanking had actual knowledge was not the specific fumes on the wrong side of [the] plumber['s] plug. Rather, it was the explosive hydrocarbons that coursed through the pipes and tanks on a regular, daily basis. The Hot Work Permit was how Oiltanking undertook to protect Delgado and the other welders from that pervasive hazard.

In resolving whether these circumstances meet Chapter 95's "actual knowledge" threshold, we look to the analysis of section 95.003(2) in *Elmgren*, 431 S.W.3d at 666. This court addressed similar contentions in *Elmgren* relating to a property owner's actual knowledge of flammable gas leaking into a pipe at a chemical plant.

Elmgren, who worked for an independent contractor, sued the property owner for injuries he sustained in an explosion while replacing a valve on a supposedly gas-free portion of pipe on the property owner's premises. *Id*. at 660. The accident occurred despite (1) the use of a "lock out tag out (LOTO) procedure to ensure there was no gas present in the line;" and (2) a "zero result" on a sniff test for flammable gas conducted approximately six hours before the explosion. *Id*. The property owner invoked Chapter 95 in response to Elmgren's negligence claim. *Id*.

Property owner Ineos sought summary judgment under section 95.003(2) because "there was no evidence Ineos had actual knowledge that gas existed in the

22

pipe on which [Elmgren] was working at the time of the accident." *Id.* at 665. "In addition to the line being LOTO and the sniff test performed prior to the work resulting in zero, Ineos pointed to testimony from [Elmgren] that he did not have any information from anyone indicating Ineos knew of any valves leaking gas before his accident." *Id.* at 665-66. Elmgren's summary judgment response pointed to evidence that the valves in question sometimes leak even when new; a similar explosion had occurred a few months earlier; the property owner's work permit required a "fire watch" procedure to be followed; and the property owner changed its procedures following the explosion to require a full nitrogen purge before allowing valve replacements. *Id.* at 666. Elmgren also pointed to testimony that "the better practice is to perform the sniff test closer in time to when the work begins." *Id.*

This court affirmed summary judgment in favor of the property owner because "none of this evidence indicates Ineos had actual knowledge of any valve allegedly leaking gas into the line that resulted in [Elmgren's] injuries at the time of the accident." *Id.* "The evidence does not show [Ineos working team leader Jonathan] Pavlovsky was aware that any new gate valve at Ineos' plant was leaking." *Id.* "The evidence shows that there had previously been flammable gas in a line during a prior repair and that there are arguably better methods for clearing and checking a line for gas." *Id.* "At most, Ineos may have had knowledge of a possibility that gas could exist in the line, but knowledge of a potential danger or condition is not enough. *Id.* (citing *Bishop v. Nabisco, Inc.*, No. 14-03-00639-CV, 2004 WL 832916, at *3 (Tex. App.—Houston [14th Dist.] Apr. 20, 2004, no pet.) (mem. op.)). Accordingly, this court concluded that Elmgren failed to proffer any evidence raising a fact question on the property owner's actual knowledge under section 95.003(2). *See Elmgren*, 431 S.W.3d at 666.

This conclusion applies with equal force here. It can be assumed for argument's sake that the claimants articulated a colorable basis for a negligent activity or negligent undertaking claim by contending that a "hazard arose during the work" performed by L-Con when Oiltanking used inferior methods for excluding hydrocarbon vapors from a hot work area; employed a "very sloppy" hot work permitting process; and used deficient sniff test procedures. Even with this assumption, more is required here after *Abutahoun* – namely, evidence of actual knowledge. *See Abutahoun*, 463 S.W.3d at 50-53. The claimants have not identified evidence that satisfies section 95.003(2) in this record. Knowledge that Oiltanking's facility handles crude oil, that "elaborate safety precautions" are warranted because the facility handles crude oil, and that the pipe at issue had been used to transport crude oil from an adjacent tank shortly before L-Con's work began, is at most knowledge of a potential danger or condition from the presence of flammable vapors. As in *Elmgren*, knowledge of this nature does not establish that "Oiltanking had actual knowledge of the danger" as required under section 95.003(2), *Abutahoun*, and Jury Question No. 3. *See Elmgren*, 431 S.W.3d at 666. To hold otherwise impermissibly would dilute the actual knowledge requirement by making it indistinguishable from the "should have known" standard for constructive knowledge. *See id.* at 665 (citing *City of Corsicana*, 249 S.W.3d at 414-15).

This conclusion is underscored by *Ineos USA, LLC v. Elmgren*, ___ S.W.3d ___, No. 14-0507, 2016 WL 3382144, at *3 (Tex. June 17, 2016), which was decided after the original panel opinion issued in this case. The Texas Supreme Court affirmed this court's determination that Elmgren proffered no evidence capable of raising a fact issue to defeat summary judgment on Chapter 95's "actual knowledge" requirement. *Id*. at *7 n.4 ("[W]e ultimately agree with the trial court

24

and the court of appeals that the Elmgrens presented no evidence that Ineos had actual knowledge of the danger or condition that resulted in Elmgren's injury."); *see also id.* at *8-9.

The supreme court noted Ineos's contention that "there was no evidence that [Ineos or its working team leader Pavlovsky] knew of any leak or that gas was present in the pipe on which Elmgren was working at the time of the accident." *Id.* at *8. "To the contrary, they contend, the record established that they lacked such knowledge because they had performed a lockout-tagout procedure and a sniff test that indicated the line had no gas in it." *Id.* "In response, the Elmgrens . . . contend that the 'danger or condition' was the presence of explosive gases and hydrocarbons in the plant." *Id.* "According to the Elmgrens . . . Ineos had actual knowledge that the entire plant was explosive." *Id.*

The supreme court rejected Elmgren's argument because "[w]e do not agree that the presence of gas at the plant was the 'danger or condition resulting in' Elmgren's injuries." *Id.* at *9. "If the mere presence of flammable or explosive gasses at a petrochemical plant were a 'danger or condition,' the property owner would always have 'actual knowledge' of the danger but would never 'fail[] to adequately warn' because the injured worker would also always have such knowledge." *Id.* The supreme court also rejected Elmgren's reliance on the existence of elaborate safety procedures to demonstrate actual knowledge. *Id.* at *8.

The supreme court's rejection of actual knowledge of a generalized hazard forecloses the claimants' rehearing reliance upon Oiltanking's "knowledge that hydrocarbons pervaded the premises;" or a contention that "Oiltanking knew full well of the hazards on its premises;" or a contention that Oiltanking knew of the "explosive hydrocarbons that coursed through the pipes and tanks on a regular,

25

daily basis." As to the specific danger, the claimants stated in their post-submission brief that the "hazardous condition of which Oiltanking had actual knowledge was not the specific fumes."

## IV.  Remaining Issues

Having concluded that there is no evidence of actual knowledge, we need not address section 95.003(1)'s control prong. *See Elmgren*, 431 S.W.3d at 666. We also need not address Oiltanking's remaining issues on appeal.

CONCLUSION

We reverse the trial court's judgment and render a take-nothing judgment in favor of Oiltanking.

/s/    William J. Boyce
Justice

Panel consists of Justices Boyce, McCally and Donovan.